STATE OF NEBRASKA, APPELLEE, v. MICHAEL J. KNIGHT, APPELLANT.
479 N.W.2d 792

Filed February 7, 1992.   No. 91-186.

Dennis R. Keefe, Lancaster County Public Defender, and Robert G. Hays for appellant.

Michael J. Knight, pro se.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

Appellant, Michael J. Knight, was convicted of conspiracy to commit first degree murder, under Neb. Rev. Stat. §§ 28-202 and 28-303 (Reissue 1989), a Class II felony, which carries a statutory penalty of 1 to 50 years' imprisonment. Appellant was sentenced to an indeterminate term of 10 to 15 years' imprisonment and ordered to pay the costs of prosecution, and he was granted credit for 253 days already served.

Laurie Loper had lived with appellant for 4 or 5 months during an 11-month period in which she was separated from her husband, Kevin. Two months after appellant had moved out of Laurie Loper's home, her husband moved into that same apartment.

Mickey Koss testified at trial that he and Knight had met in the penitentiary and had known each other for 2 years. He claimed that in May 1990, he and Knight were both housed in the "trusty dorm" of the Lancaster County jail, in which dorm inmates have 24-hour access to a telephone.

According to Koss' testimony, Knight had discussed with him that he was still in love with Laurie Loper, but that her husband would soon be released from the penitentiary and reuniting with her. Koss testified that Knight was furious about losing Laurie Loper to her husband.

Knight asked Koss to assist him in "having Mr. Loper's legs broken." Later, Knight told Koss that he wanted Kevin Loper "offed" and asked whether Koss knew anyone who might do that. Koss responded that he might.

Koss called Charlie Daniels of the Lincoln Police Department and explained to him what had been transpiring. Officer Daniels met with Koss and learned from him that Knight wanted Kevin Loper offed and that Knight wanted the key to the dead bolt to the Lopers' apartment retrieved.

The following day, Koss told Knight that he had found a person named "Bill" to take care of Knight's problem and that Koss was to call Bill between 5 and 5:30 p.m. that evening. Koss testified that it had been his understanding that the person named "Bill" would be a police officer. Knight was agreeable with the plan and wanted Koss "to go through with the plan."

Koss placed the phone call shortly after 5:30 p.m. Once he had reached the person who identified himself as Bill, Koss handed the telephone over to Knight.

After his telephone conversation with Bill, Knight asked Koss to loan him $500 to pay Bill, and Knight also talked about paying Bill off in drugs. Later that evening, a note was brought to Knight which stated that there was an emergency at home and that he was to call a particular number. Koss had overheard Knight tell Bill to use this method to contact Knight. Knight requested that Koss dial the number; then Knight engaged in another telephone conversation for 10 to 15 minutes. Following this conversation, Knight asked Koss if the person on the phone was reliable. Koss assured Knight that he was. Koss left the jail the following day when the Lincoln Police Department posted his $50 bond.

Det. Sgt. Gregory Sorensen testified that on May 14, 1990, he was assigned to portray a hired killer and talked to Knight by telephone about killing Kevin Loper. At approximately 5:30 p.m., Sorensen received a phone call from a person who identified himself as Mick, and subsequently, a 20-minute tape-recorded conversation ensued with Knight. This tape was played to the jury.

Sorensen set up a second recorded telephone conversation by calling the jail and leaving a number for Knight to call. A few minutes later a person identifying himself as Mick returned the call. After speaking with Mick, Sorensen had another telephone conversation with Knight. In this conversation, which lasted 10 to 15 minutes, Sorensen and Knight discussed

the murder plans. The next day, in a third recorded phone conversation, Sorensen told Knight that he had everything set up for the murder. Sorensen discussed how he was to be paid and how he intended to deliver Kevin Loper's keys to Knight. These two recorded conversations were also played to the jury.

Knight alleges in what we have summarized as eight assignments of error that the district court abused its discretion by (1) overruling his plea in abatement, (2) overruling his demurrer, (3) sustaining the State's objection to his cross-examination of Koss regarding Koss' attempts to avoid incarceration, (4) overruling his motion to dismiss at the close of the State's case, (5) overruling his motion for directed verdict at the close of the evidence, (6) sustaining a verdict that was not supported by sufficient evidence and was contrary to law, (7) imposing a sentence that was excessive and disproportionate to the severity of the offense when considered with his background and prior record, and (8) overruling his motion for a new trial.

Appellant did not argue the first, second, and eighth assignments of error, and we consider them no further. See *In re Interest of P.M.C.*, 231 Neb. 701, 437 N.W.2d 786 (1989). Neb. Ct. R. of Prac. 9D(1)d (rev. 1991) states that "consideration of the case will be limited to errors assigned *and* discussed." (Emphasis supplied.)

Appellant's third assignment of error addresses the court's failure to allow him to cross-examine Koss on Koss' desires and attempts to get out of jail or on Koss' motivations for initiating police involvement and continuing his cooperation. While normally it is appropriate and expected to allow cross-examination of a witness on biases and motivations for testifying against a party, the court may preclude such from entering into evidence if its probative value is outweighed by its prejudicial effect, marginal relevance, or its potential for fostering confusion of issues for the jury. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). No evidence existed to cast either a valid entrapment defense or an argument that Koss had enticed the appellant into the conspiracy. The court did not err in the exclusion of the cross-examination of Koss on these issues.

The fourth, fifth, and sixth assignments of error question the sufficiency of the evidence to overrule appellant's motion to dismiss and his motion for directed verdict and to sustain his conviction. We find that the evidence was sufficient and affirm the district court's determinations.

With Nebraska's adoption of § 28-202, there came a shift from a bilateral approach to conspiracy to a unilateral approach. Where we once required for conviction of conspiracy "a meeting of the minds," or joint intent, we now require only that the accused

> agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and (b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

§ 28-202(1). Under the present scheme, which follows the Model Penal Code's interpretation of conspiracy, the fact that none of the "coconspirators" at any time planned to follow through with the plan has no impact on the culpability of the appellant.

The testimony that appellant initiated conversations about "offing" Kevin Loper and his participation in three telephone conversations with "Bill" about his plan and specific instructions to assist in bringing the plan to fruition provide sufficient evidence of overt acts to sustain the conspiracy conviction.

Finally, appellant asserts that the sentence imposed was excessive. "[T]he imposition of a sentence within the statutorily prescribed limits will not be disturbed on appeal absent an abuse of discretion." *State v. Morley, ante* p. 141, 156, 474 N.W.2d 660, 670 (1991). Appellant's sentence is well within the statutory limits. Conspiracy to commit murder is a Class II felony. See §§ 28-202(4) and 28-303. A minimum of 1 year's imprisonment and a maximum of 50 years' imprisonment is authorized for this class of offense. Neb. Rev. Stat. § 28-105 (Reissue 1989).

Appellant's contention that the seriousness of his offense did not warrant the 10- to 15-year indeterminate sentence imposed

upon him is without merit. Appellant conspired to commit murder while in jail on another charge and was unsuccessful in his conspiracy only because he was unwise in his choice of a coconspirator. Koss testified that the appellant had told him that if he ever "needed anything or anybody taken care of, that [Knight] would do that" for Koss if Koss would come up with the money to pay off the hit man who was to kill Kevin Loper.

We are convinced that the appellant's crime is sufficiently serious to warrant the sentence received, which is well within the statutory limits. We find no abuse of discretion, and accordingly, we affirm the judgment in its entirety.

AFFIRMED.