STATE OF NEBRASKA, APPELLEE, V. JEFF BOPPRE, APPELLANT.
503 N.W.2d 526

Filed July 30, 1993. No. S-92-519.

Lawrence G. Whelan for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

In *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990) (*Boppre I*), we affirmed the judgments adjudicating the convict appellant herein, Jeff Boppre, guilty of two counts of first degree murder, in violation of Neb. Rev. Stat. § 28-303 (Reissue 1989), two counts of robbery, in violation of Neb. Rev. Stat. § 28-324 (Reissue 1989), and two counts of using a firearm to commit a felony, in violation of Neb. Rev. Stat. § 28-1205(1) (Reissue 1989). The convict thereafter filed a motion for new trial, which the district court overruled. In this appeal from that ruling, the convict asserts, in summary, that the district court erred by failing to (1) find prosecutorial misconduct, (2) find the existence of newly discovered evidence, and (3) receive evidence concerning the early vote of the jury. We affirm.

## II. SCOPE OF REVIEW

The convict asserts he is entitled to a new trial under Neb. Rev. Stat. § 29-2101 (Reissue 1989), which provides, so far as is relevant to the allegations in his motion:

A new trial, after a verdict of conviction, may be granted, on the application of the [convict], for any of the following reasons affecting materially his substantial rights: (1) Irregularity in the proceedings of the court, or the prosecuting attorney, or the witnesses for the state, or any order of the court, or abuse of discretion, by which the defendant was prevented from having a fair trial; (2) misconduct of the jury or the prosecuting attorney, or of the witnesses for the state . . . (5) newly discovered evidence material for the [convict] which he could not with reasonable diligence have discovered and produced at the trial . . . .

We have held that a motion for new trial on the basis of newly

discovered evidence is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed on appeal. *State v. Campbell*, 239 Neb. 14, 473 N.W.2d 420 (1991); *State v. Jensen*, 238 Neb. 801, 472 N.W.2d 423 (1991); *State v. Fellman*, 236 Neb. 850, 464 N.W.2d 181 (1991). We now hold that the same standard of review applies to the other grounds asserted in the motion for new trial filed herein.

## III. FACTS

The facts as adduced at the convict's trial are contained in *Boppre I* and are not repeated herein, except as otherwise specifically indicated. Except as so indicated, the facts hereinafter set forth were developed at the hearing on the convict's motion for new trial and relate to the summarized assignments of error which the convict has discussed in his brief. The convict has also made arguments based on material which the district court excluded from the evidence but which rulings the convict has not assigned as error. Inasmuch as Neb. Ct. R. of Prac. 9D(1)d (rev. 1992) provides that, save for plain error we might choose to review, consideration of a case will be limited to the errors assigned, we do not concern ourselves with those arguments. See, *Baker's Supermarkets v. Feldman, ante* p. 684, 502 N.W.2d 428 (1993); *State v. Martin, ante* p. 368, 500 N.W.2d 512 (1993); *State v. Knight*, 239 Neb. 958, 479 N.W.2d 792 (1992).

### 1. PROSECUTOR'S CONDUCT

The claim of prosecutorial misconduct embodied in the first summarized assignment of error centers on the trial testimony of Alan Niemann and on the failure of the prosecution to have revealed the existence of Melissa Moreno, who once claimed to have been present while the murders were committed.

### (a) Niemann Testimony

After being contacted by a fellow inmate on Niemann's behalf, a group of private investigators hired by the convict's family met with Niemann at the Omaha Correctional Center. As a result, Niemann both signed an affidavit and made a sworn oral statement which was reported by a member of a firm of reporters.

In the affidavit Niemann recites, in part:

> The testimony I gave [at trial] was not a true and accurate depiction of my knowledge of the incidents . . . . The product of my testimony was a direct result of the use of threats, intimidation, and coercion I was subjected to by the present Scottsbluff [sic] County Attorney, Brian Silverman. Mr. Silverman stated that if I did not testify the way that he wanted me to I would be charged with two counts of murder. Furthermore, Mr. Silverman gave me several typed pages detailing the information he wanted me to testify to. Mr. Silverman told me to "read and memorize these pages and get it right."

The affidavit further declares that Niemann obtained the specific details in his testimony regarding the murders from typed information Brian Silverman told him to testify to; from Silverman's "coaching" of testimony on not less than eight occasions; from information his attorney told him about statements his former roommate, Kenard Wasmer, was making; and from newspaper articles.

According to the affidavit, the true facts, which directly contradict his trial testimony, are the following:

> I was never in the house rented by Richard Valdez.
>
> I never saw Jeff Boppre shoot Richard Valdez or Sharon Condon.
>
> I never saw Richard Valdez laying on the floor or move while on the floor after being shot.
>
> I never saw Jeff Boppre break out a light bulb in the Valdez house.
>
> I never removed any items from the Valdez house.
>
> I have never been in possession or have any knowledge of scales Richard Valdez owned or had at his residence.
>
> I never saw Jeff Boppre throw away a gun either going to or coming back from Phoeniz [sic], Arizona.
>
> The camera used at trial was my camera that I had owned a long time prior to the murders.
>
> Jeff at no time stated to me, "You should have heard that bitch beg for her life."

These clear and concise affidavit declarations stand in stark contrast to Niemann's oral statement, which is almost entirely

devoid of questioning regarding coerced and coached testimony or the specific denials of his trial testimony. For the most part, Niemann is unable in his statement to clearly recall or state what he actually did or saw on the night of the murders. He believes that the convict made three or four trips to the residence of Richard Valdez for the purpose of purchasing cocaine, the last two trips being made after midnight, when one of their acquaintances went home for the evening. After the convict, Wasmer, and Niemann finished using the cocaine, which was probably around 1 a.m., the convict left to go home to bed. Sometime later, possibly after 15 to 45 minutes, the convict returned, asking whether Niemann and Wasmer wanted to go to Phoenix. The three had previously discussed going there, but had no definite plan to do so. Shortly after the convict returned, the three left for Arizona without packing anything for the trip. Niemann denied that he or the convict brought an army coat full of items stolen from Valdez into the trailer. Niemann also denied that he and the convict walked to a cliff west of Gallup, New Mexico, and threw a gun away, saying, rather, "We walked down to the cliff and took a leak."

The State produced three affidavits in rebuttal of Niemann's recantation of his trial testimony. The first was from James Snyder, an investigator with the Nebraska State Patrol. Snyder interviewed Niemann on two different occasions after the convict's investigators had done so, and on both occasions Niemann told Snyder that his sworn testimony at trial was the truth. Niemann also stated that he recanted his trial testimony to the convict's investigators so that they would quit bothering him.

Before considering the second affidavit, which was made by Robert Kinsey, a detective lieutenant of the Scottsbluff Police Department, we point out that the trial record demonstrates that when Kinsey first met with Niemann at the Scottsbluff office of the State Patrol, Niemann claimed that the convict had left Niemann's home at 1 o'clock on the morning of the murders to go to the convict's own house in order to change clothes and stop at the bank to get cash. The convict returned a short time later, and they left for Phoenix at that time. Niemann also told Kinsey that the convict and Wasmer were wearing the

same clothes at the time of the convict's arrest as when they left for Phoenix. Niemann also said that the convict traded the gun, which later proved to be the murder weapon, to Valdez for cocaine about a week before the murders. At that point in the interview, Kinsey gave Niemann the *Miranda* warnings even though Niemann was not then under arrest, according to Kinsey's new trial affidavit. Niemann then elected to have an attorney present; the interview was terminated, and Niemann was allowed to leave the State Patrol office. Later that evening, Niemann was arrested at his home when a search and arrest warrant was executed. Niemann was then interviewed a couple of days later in the presence of his attorney, Charles Fitzke. According to the trial record, after his arrest and until trial, Niemann was not allowed to speak to Wasmer about the case.

The third affidavit is that of Fitzke, the then public defender for Scotts Bluff County. By the time he was appointed to represent Niemann, Niemann was being held in the Scotts Bluff County jail and had been charged with Class II felony robbery. The two discussed the circumstances of Niemann's involvement. After those discussions, Fitzke informed the prosecution that Niemann was willing to cooperate and testify truthfully regarding his involvement if the State would reduce his charges to a Class III felony. To Fitzke's knowledge, the prosecution had no information as to what Niemann would say or would be able to testify to until he was first interviewed in Fitzke's presence. Niemann's statement at that time was consistent with the one he had previously given to Fitzke, and at no time did the prosecuting attorney, his deputies, or the investigator coerce or intimidate Niemann or supply him with any information.

### (b) Moreno's Existence

Three and a half days after the murders, Melissa Moreno, then a high school junior, claimed to two of her classmates that she had been present at the murders.

According to these classmates, Moreno appeared to be "really scared and sad," and turned around looking the other way prior to talking with them. Moreno said she had been with the victim Sharon Condon the day of the murders and had gone

to the Valdez residence that evening at around 7 p.m. Numerous persons visited the Valdez residence. Later, between 11 p.m. and midnight, Moreno and Condon, who were then apparently alone in the house, heard noises and people talking outside the house. When they heard noises at the back door sounding as though someone was breaking in, Condon told Moreno to go hide. Moreno went into the bedroom and hid under the bed.

Moreno continued that she heard Condon's footsteps as she entered the doorway of the bedroom, three different male voices, and footsteps entering the house by the back door. Initially, one of the men walked toward the bedroom while the other two walked around in other parts of the house. Moreno heard some men talking, but she did not know what they were saying. She then heard Condon's scream and gunshots.

Moreno knew the convict and his voice and claimed that she "knew it wasn't his voice" and that "he didn't do it." Three gunshots were fired initially, and after the other two intruders' footsteps approached the bedroom, three or four additional shots were fired. The shots seemed to be directed into the bedroom; Moreno did not hear Condon say or do anything after screaming at the first shots. Moreno heard one of the three running away and then a light or light bulb breaking. At that point, she heard what she believed to be a fourth party coming in the back door, followed by two or three additional gunshots. Moreno believed it had been Valdez entering the house and being shot by one of the three intruders. Following that shooting, the intruders "were running through the house . . . . They were picking up things and they were running. [Moreno] heard them run out the door, and she heard a car door slam and then the car take off."

Moreno claimed to have waited under the bed for about 10 minutes to be certain everyone was out of the house. When she got out from under the bed, she was unable to see much in the darkness. She ran toward the kitchen and heard glass crackling under her. Looking down, she saw a body in the kitchen area. She ran out of the Valdez house through the back door to a nearby house.

Moreno then broke off her story, as other students were entering the classroom and class was called to order. At other

times, Moreno told a teacher and guidance counselor that she had knowledge of the murders, and she told the entire classroom that she was at the murder scene under the bed, without elaborating the details.

The two classmates Moreno initially talked with told a third student of Moreno's version of what she witnessed at the murder scene. When this third student told her mother what she had heard, the mother notified law enforcement officials. As a result, the third student was interviewed by an officer and gave a signed statement.

Moreno was questioned by a deputy sheriff approximately a week after her conversation with her classmates. Although she admitted that she had said she was in the Valdez residence, she denied telling anyone that she was under the bed when the shooting occurred. She explained that she was upset and confused, and "it was just something she made up out of frustration and anger and she apologized for making the statement." She knew only what she had heard from the media and others. Moreno also told police that she was very close to the victims and that she was like their little sister. She had been at the Valdez house many times, occasionally staying overnight, and had been present several times when Valdez prepared marijuana and cocaine for sale, use, and distribution. She did not know the convict well but had been present a couple of times when he purchased cocaine and marijuana. Moreno had seen the convict and Valdez argue and shout at each other while negotiating drug deals, and Condon had told her Valdez did not like or trust the convict.

On the evening of the murders, Moreno, Condon, and Valdez had gotten food and gone cruising in Condon's automobile. After cruising for awhile, Condon and Valdez dropped Moreno off at a party in Scottsbluff.

In her initial statement to police, Moreno said she had left the party twice, walking to nearby locations to see other friends and relatives, leaving at 3 or 4 o'clock Monday morning. In a later affidavit, Moreno recited that after being left off at the party at 9 p.m., she did not recall leaving the house where the party was held.

The convict's trial counsel, Leonard Tabor, testified that at

the relevant time defense counsel in the area were not permitted to obtain copies of police reports but could review the file, take notes, and dictate from the material. They were, however, provided copies of all laboratory reports. Tabor was never denied an opportunity to examine police reports in the county attorney's office, and none of those involved in the police investigation ever refused to show him evidence or cooperate with his requests to see evidence. Tabor dictated from some of the reports in the case and took handwritten notes on those he deemed less important.

Tabor did not recall Moreno's name surfacing at any point and is certain that neither she nor anyone else was ever identified as a.potential eyewitness to the murders via any discovery he was allowed. He first learned of Moreno's claimed presence at the murders long after trial through the convict's private investigators.

## 2. OTHER EVIDENCE CLAIMED TO BE NEWLY DISCOVERED

The claim asserted in connection with the second summarized assignment of error, that there exists material newly discovered evidence which the convict could not with reasonable diligence have discovered and adduced at trial, involves, in addition to the matters discussed in connection with the prosecutor's conduct, the testimony of the convict's sister-in-law, Lori Boppre, the wife of the convict's brother, Danny; the offer of proof of a handwriting expert; and the theory of a "criminalist."

### (a) Sister-in-Law's Testimony

The sister-in-law claims that her testimony at trial was not fully truthful, as her husband had physically abused her on several occasions and had threatened her life and that of their son.

She asserts that her husband told her what to say to the convict's defense attorney and how to testify at trial. According to the sister-in-law, her husband told her "not to mention that he was there when the murders were talked about. He told [her] to only mention, that he was there to smoke weed with Kenard and Alan, and that anything pertaining to the murders [she] was not supposed to mention."

After the murders, Wasmer and Niemann no longer frequented her home. Even after her husband was imprisoned, she did not come forward to correct her inaccurate testimony because she remained in fear of him and his family. In fact, she did not reveal the inaccuracy of her testimony until she had been contacted three or four times by the convict's investigators, deciding to do so only after consulting with her therapist.

The sister-in-law now claims that shortly before the murders, she heard her husband, Wasmer, Niemann, and one Ruff discuss murdering someone whom she later learned to be Valdez. One of them said that they "should do the person that they got this terrible weed from." After that time, she, on at least 10 occasions, heard the four discussing and planning a murder on virtually a daily basis. The convict was never a party to the discussions.

According to her testimony at the hearing on the new trial motion, "We were out at Danny's parents' house, and they were all in the garage, and they came out, and Danny told me later on that Ricky Zogg offered him $10,000 to kill Richard Valdez, and [Wasmer] and [Niemann] were present." However, later during her direct examination, the following exchange occurred:

> Q. Did you hear your husband say, that he wanted to kill Valdez and steal his money, and his dope?
>
> A. No. Because of the fact, that he never mentioned who they were talking about.
>
> Q. Well, did you hear him say, that he wanted to kill somebody and steal their money and dope?
>
> A. Yes.

The sister-in-law claims that on one occasion her husband said that he "didn't have any money, he didn't have anything to sell, he was tired of being broke, and wanted some money and drugs."

She heard the four discuss trying to find a way to involve the convict, because they knew he planned a trip to Arizona sometime soon and because they had fired the convict's gun when her husband had borrowed it.

Her husband had known Niemann since the two were

classmates in the seventh or eighth grade, and came to know Wasmer when he moved to the Scottsbluff area in August 1988. She claims that Wasmer and Niemann wanted to meet with the convict but that he was always working, so they were not introduced to him until sometime in September. However, at trial the convict testified that he had encountered Niemann and Wasmer in early August through his brother and that he began to obtain cocaine for them in late August.

The sister-in-law's affidavit outlines the events immediately surrounding the murders as follows:

During the week prior to the Valdez/Condon murders, Jeff Boppre mentioned the fact that he was planning a trip to Arizona. Once Danny Boppre, Alan Niemann and Kenard Wasmer heard the news that Jeff Boppre would be going to Arizona, they started talking more about killing someone and now mentioned the fact that they would be going to Arizona.

On the evening of Sunday, September 18, 1988, Alan Niemann, Kenard Wasmer, Kevin Cushing, Chris Ruff and a friend of Chris Ruff's were at our residence . . . . During that time, Danny and I began arguing over the fact that I was tired of listening to them talk about killing someone. At 7:00 P.M. all of the men departed including Danny Boppre. At 9:00 P.M. Danny Boppre returned to our residence. A short time later, I observed Danny pacing the floor, repeatedly looking out the window and he appeared overly anxious and nervous. I asked Danny who he was looking for. Danny replied that he was waiting for Wasmer. Between 12:30 and 12:45 A.M. Kenard Wasmer arrived at our residence. I let Wasmer in the door and asked him where Niemann was. Wasmer told me that it was none of my business. Because Wasmer and Niemann were always together, I again asked Wasmer where Niemann was. This time, Wasmer state[d], "he's taking care of business." Wasmer appeared visibly upset. As soon as Wasmer entered our home, Danny lead [sic] him into the back bedroom where they proceeded to talk in private for fifteen to twenty minutes. Within a short time, Wasmer departed. After Wasmer was gone, Danny stated

to me that he may have to leave in a while and go to Wasmer and Niemann's trailer.

The sister-in-law claims that after the murders, her husband had a never-ending supply of marijuana and money. On one occasion she saw $3,000 in his possession.

### (b) Handwriting Offer

The convict offered the testimony of a handwriting expert who had examined the videotapes and photographs of the crime scene depicting the writing on the floor and doorjamb near Valdez' body and handwriting exemplars of Niemann, Zogg, Valdez, Wasmer, and the convict.

After the district court sustained the State's objection to this testimony on the grounds that the evidence was not newly discovered, the convict offered to prove that in this witness' view, the evidence available is insufficient to render a positive opinion as to the authorship of the writings. The expert would opine that the writings are inconsistent with writing samples of Valdez and the other individuals, with the exception of Zogg. He found, "There were identifiable habits in the writing on the floor and/or the wall that also can be seen in the writing of Mr. Zogg, although I am not saying Mr. Zogg wrote it."

### (c) Criminalist's Theory

One claiming to be knowledgeable about firearms and crime scene evidence characterized himself as a criminalist, which he defined as "one who works with the forensic sciences whether it be firearms, a questioned document, chemistry, whatever area . . . of expertise." He reviewed the evidence and prepared an affidavit summarizing his findings. From viewing the videotapes of the crime scene, he concluded that the rear door of the house was kicked open, pulling the screws out of the section of a hasp attached to the doorjamb. This affiant claims that on a longer videotape not shown to the jury, a law enforcement officer can be heard to say, "That door was kicked in." (This longer videotape is not included in the record forwarded on appeal, but the convict asserts it had been admitted as evidence.) The affiant is of the view that such is inconsistent with Niemann's trial testimony that the convict knocked on the door at the Valdez residence, spoke with an

occupant through the door, and was then admitted into the house. Based upon the bloodstains, Valdez' blood ran from the body or an extremity rather than splattering. Because there was no splattering or blood trail and there was no soiling of the knees or legs of Valdez' pants, nor were his feet dirty or bloody, it is, in the affiant's view, improbable that Valdez moved himself from where he was shot. However, based upon Valdez' shirt being pulled up in back, there being broken glass under the body, and a tube of grease under or near the body's left hip, which grease was apparently used in the writings found on the floor near the body, it appears to the affiant that Valdez' body was moved a short distance.

The affiant also was of the opinion that there should have been latent fingerprints in the writings in blood on the doorjamb and in grease on the floor.

### 3. JURY VOTE

Apparently claiming the jury's vote at various stages of its deliberations somehow bears on the quality of the verdict, the convict, after the district court sustained the State's objection thereto, offered to prove that the first vote taken by the jury was 9 to 3 for acquittal and the second 6 to 6.

## IV. ANALYSIS

With that factual background, we turn to the legal analysis of the issues presented by the convict's summarized assignments of error.

### 1. PROSECUTOR'S CONDUCT

The convict's first summarized assignment of error, challenging the prosecutor's conduct, relates to "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). At issue are not statutory rights to discovery, but, rather, one's "right to a fair trial mandated by the Due Process Clause of the Fifth Amendment to the Constitution." *United States v. Agurs*, 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).

In *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the U.S. Supreme Court laid down the principle

that irrespective of the good or bad faith of the prosecution, its suppression of evidence favorable to an accused violates due process if the evidence is material to either guilt or punishment.

In *United States v. Agurs*, the U.S. Supreme Court clarified the *Brady* rule as follows:

> The rule . . . arguably applies in three quite different situations. Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.

> In the first situation, typified by *Mooney v. Holohan*, 294 U. S. 103, [55 S. Ct. 340, 79 L. Ed. 791 (1935)] the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury. In a series of subsequent cases, the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . . In those cases the Court has applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process. . . .

> The second situation, illustrated by the *Brady* case itself, is characterized by a pretrial request for specific evidence. In that case defense counsel had requested the extrajudicial statements made by Brady's accomplice, one Boblit. This Court held that the suppression of one of Boblit's statements deprived Brady of due process, noting specifically that the statement had been requested and that it was "material." A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.

> . . . .

> The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made. . . .

. . . .

In many cases . . . exculpatory information in the possession of the prosecutor may be unknown to defense counsel. In such a situation he may make no request at all, or possibly ask for "all *Brady* material" or for "anything exculpatory." Such a request really gives the prosecutor no better notice than if no request is made. If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. The third situation in which the *Brady* rule arguably applies, typified by this case, therefore embraces the case in which only a general request for "*Brady* material" has been made.

We now consider whether the prosecutor has any constitutional duty to volunteer exculpatory matter to the defense, and if so, what standard of materiality gives rise to that duty.

. . . .

The Court of Appeals appears to have assumed that the prosecutor has a constitutional obligation to disclose any information that might affect the jury's verdict. That statement of a constitutional standard of materiality approaches the "sporting theory of justice" which the Court expressly rejected in *Brady*. For a jury's appraisal of a case "might" be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt. If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would

be to allow complete discovery of his files as a matter of routine practice.

. . . [T]his Court recently noted that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois*, 408 U. S. 786, 795[, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972)]. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.

Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor. If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it. Cf. *Giglio v. United States*, 405 U. S. 150, 154[, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)]. . . .

. . . .

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

This statement of the standard of materiality describes the test which courts appear to have applied in actual cases although the standard has been phrased in different language.

427 U.S. at 103-13.

### (a) Niemann's Testimony

The first aspect of the convict's claim that the prosecutor engaged in misconduct rests on the claim that the prosecutor knowingly used at trial Niemann's perjured testimony.

The critical flaw in the argument is the premise that Niemann's trial testimony has been shown to be false. Such is simply not the case. The recitation of the record in part III(1)(a) of this opinion does establish that Niemann is a self-confessed liar, but there is no demonstration that he was truthful when he recanted his trial testimony to the convict's investigators rather than when he testified at trial and when he talked with the State's investigators.

Moreover, in considering claims of perjured testimony later recanted in connection with a motion for new trial, we have written:

> "Newly discovered evidence must be of such a nature that if it had been offered and admitted at the former trial it probably would have produced a substantially different result." . . . "[E]vidence tendered in support of a motion for new trial on the ground of newly discovered evidence must be so potent that, by strengthening evidence already offered, a new trial would probably result in a different verdict."

*State v. Pittman*, 210 Neb. 117, 120-21, 313 N.W.2d 252, 256 (1981). See, also, *Fugate v. State*, 169 Neb. 434, 99 N.W.2d 874 (1959).

Even if Niemann had at trial denied any involvement by the convict, the testimony of Wasmer and Zogg and the other trial evidence make a different result improbable. The statements Wasmer attributed to the convict are damning: " 'Let's just go blow [Valdez] away' "; " '[T]here couldn't be any witnesses' "; " '[Y]ou should have seen it. . . . You should have seen that bitch plead for her life' "; " ' "That wasn't good but it wasn't bad either for taking two people's lives" ' "; and in reference to how he felt about the killings, " ' "I like it, I want to do it again." ' " *Boppre I*, 234 Neb. at 926-28, 453 N.W.2d at 414-15.

### (b) Moreno's Existence

The second aspect of the convict's claim that the prosecutor

engaged in misconduct arises from the prosecutor's claimed failure to reveal Moreno's existence.

We begin our analysis of this phase of the matter by noting that the convict's pretrial discovery requests were lengthy and detailed, seeking, inter alia:

> Names and addresses of all witnesses having knowledge of the offense who the State intends to call as witnesses, or, on whose evidence the charge is based.
>
> . . . .
>
> The [convict] further requests the court enter an Order requiring the prosecution in this case to make timely disclosure to counsel for the [convict] of the existence of any evidence known to the prosecution for [sic] which could be discovered by the prosecution, that tends to negate the guilt of the accused, mitigate the degree of his offense, reduce the punishment, or as otherwise material to the above. The [convict] further requests the court enter an Order requiring the prosecution to disclose any threats, promises, or representations made to any witness, which may affect the witness's testimony.

The trial court's order on those two sections of the convict's discovery requests reads:

> [T]he State is not required to furnish defense with any and all prior statements, whether written or not, made by all witnesses the State may call at trial . . . .
>
> . . . .
>
> . . . [T]he State · shall provide to the [convict] information concerning threats, promises or representations made to any witness which may affect issues of credibility and evidence which tends to negate the guilt of the accused, mitigate the degree of the offers [sic] or reduce the punishment.

The first quoted section of the request is addressed to witnesses upon whose evidence the charges are based or who might be called by the State as witnesses. Neither Moreno nor the two classmates to whom Moreno first made her claim of presence at the murder scene are potential State's witnesses or the sources of evidence to support the charges. As a result, this is not a case involving exculpatory evidence which was the

subject of a specific request, as in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

The second quoted portion of the convict's discovery request and the portion of the order related thereto fit the third type of case described in *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), that is, that which requests all *Brady* material or anything exculpatory. The *Agurs* standard for determining materiality which rises to a constitutional error in such a situation is that any omission must be evaluated, in the context of the entire record, to determine if the omitted evidence creates a reasonable doubt that did not otherwise exist.

In making that evaluation, it is first to be noted that the convict has failed to show what Moreno would say if she were called to testify at a new trial. In the context of postconviction relief cases, we have said that to sustain a claim of ineffective assistance of counsel based on the failure to interview witnesses, the record must establish the testimony of the witnesses counsel failed to interview. *State v. Gagliano*, 231 Neb. 911, 438 N.W.2d 783 (1989). It would seem appropriate that no less a showing be required to evaluate whether a new trial should be granted. However, the convict's position is that in this instance what Moreno would testify to does not make any difference, for if she were to say she had been present and that the voice of the killer was not that of the convict, the convict would have made his point. If, on the other hand, she were to testify that she had not been present, the convict would be able to impeach her by her prior inconsistent statements and thereby again make his point.

What this approach overlooks, however, is that although Neb. Rev. Stat. § 27-607 (Reissue 1989) provides that the "credibility of a witness may be attacked by any party, including the party calling" her or him, a party may not use a prior inconsistent statement of a witness under the guise of impeachment for the primary purpose of placing before the jury substantive evidence which is not otherwise admissible. *State v. Watkins*, 227 Neb. 677, 419 N.W.2d 660 (1988); *State v. Brehmer*, 211 Neb. 29, 317 N.W.2d 885 (1982).

The only extrinsic evidence of Moreno's claim that she was present at the murder scene, the statements she made to her

classmates, is hearsay and thus not admissible as substantive evidence. As the district court observed, the statements are not exempted from the hearsay rule as constituting excited utterances. As recently noted, in order for a statement to qualify as an excited utterance, there must have been a startling event, the statement must have related to the event, and the statement must have been made while under the stress of the event; the key requirement is spontaneity, a showing that the statement was made without time for conscious reflection. *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993). Moreno did not make the claim that she had been present at the scene until 3 1/2 days after the murders. We recognize that the time interval between the startling event and the statements is not in and of itself dispositive of the spontaneity issue, *State v. Roy*, 214 Neb. 204, 333 N.W.2d 398 (1983); how long the interval may be must be determined by the facts unique to each particular case, *State v. Jacob, supra*. While in *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990), we found 2 days not to have been too long an interval for the statement a 4-year-old made to police concerning injuries inflicted upon her stepbrother, 3 1/2 days is too long in this case. Not only were Moreno's statements made in a social rather than an investigative setting, she was not a 4-year-old child.

Moreno's statements to her classmates were made after extensive time for conscious reflection; thus, the requisite spontaneity is lacking. In so ruling, we do not overlook the fact that she was described as being scared when she made the claim of being present at the murder scene, but given the time interval, it cannot reliably be said that the perceived fright resulted from the event. It is as likely to have been part of the drama created in the making of the statements.

In any event, the statements once made by Moreno, upon which the convict places so much reliance, were, when all is said and done, not only recanted but were made by one who claimed to have been hiding under a bed, in the dark, and who was in fear for her own life. She never claimed to have seen anything relevant to the killing. Thus, while she claimed the voice she heard did not belong to the convict, she never was in a position to claim that the convict was not present at the scene or that he

was not the one who shot the victims. Given those circumstances and the trial evidence outlined in *Boppre I*, it cannot be said that Moreno's testimony is material in the *Agurs* sense, for no matter what she might say at a new trial, it would not create a reasonable doubt as to the convict's guilt which did not otherwise exist.

## 2. OTHER EVIDENCE CLAIMED TO BE NEWLY DISCOVERED

In addition to the topics discussed in connection with the prosecutor's conduct, the matters involved in the second summarized assignment of error, the claim that there exists other newly discovered evidence warranting a new trial, are as identified in part III(2) hereof.

We recall as an initial matter that the newly discovered evidence offered in support of a new trial must be so potent that by strengthening the evidence already offered, a new trial would probably result in a different verdict; the newly discovered evidence must be relevant and credible and not merely cumulative. *State v. Fellman*, 236 Neb. 850, 464 N.W.2d 181 (1991); *State v. Batiste*, 231 Neb. 481, 437 N.W.2d 125 (1989), *disapproved on other grounds, State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989). The evidence must actually be newly discovered and may not be something which could have been discovered and produced at trial with reasonable diligence. See *State v. Jensen*, 238 Neb. 801, 472 N.W.2d 423 (1991).

### (a) Sister-in-Law's Testimony

Since the coercion which the sister-in-law now claims was not revealed until long after trial, her present testimony, that the convict was not a part of the planning discussions she overheard, may be characterized as newly discovered. However, her new testimony does no more than add to the convict's claim at trial that many people may have had a motive to kill Valdez and that there may have been a conspiracy to accomplish that. Thus, the new testimony would merely be cumulative. Since the sister-in-law cannot say that the convict was not involved, only that she did not see him around when she heard discussions concerning the killing, it cannot be said that her testimony would probably have resulted in a different verdict.

### (b) Handwriting Offer

Given that at trial the convict attempted but failed to develop handwriting evidence, it cannot be said that what he offered to prove in that regard at the hearing on his new trial motion was newly discovered.

### (c) Criminalist's Theories

Nor are the criminalist's theories newly discovered evidence. He merely sought to evaluate bits and pieces of the trial evidence favorably to the convict.

### 3. JURY VOTE

Although the convict calls attention to our observation in *State v. Dandridge*, 209 Neb. 885, 312 N.W.2d 286 (1981), that where a verdict is of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt, he cites no authority for his proposition that evidence of a jury's initial votes is admissible in seeking a new trial.

The matter is controlled by Neb. Rev. Stat. § 27-606(2) (Reissue 1989):

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes.

In applying that rule, we have held that although a juror may testify that extraneous material was improperly brought to the jury's attention, a juror may not testify as to the effect the material had on the deliberation process. *State v. Steinmark*, 201 Neb. 200, 266 N.W.2d 751 (1978). See, *Loving v. Baker's*

*Supermarkets*, 238 Neb. 727, 472 N.W.2d 695 (1991); *State v. Meyer*, 236 Neb. 253, 460 N.W.2d 656 (1990); *State v. McDonald*, 230 Neb. 85, 430 N.W.2d 282 (1988); *State v. Roberts*, 227 Neb. 489, 418 N.W.2d 246 (1988).

In applying the federal counterpart to § 27-606(2), Fed. R. Evid. 606(b), the U.S. Court of Appeals for the Seventh Circuit has noted that the rule is designed to protect the jury's deliberation process, including its votes. *Michaels v. Michaels*, 767 F.2d 1185 (7th Cir. 1985), *cert. denied* 474 U.S. 1057, 106 S. Ct. 797, 88 L. Ed. 2d 774 (1986) (civil case). Accord *Wiedemann v. Galiano*, 722 F.2d 335 (7th Cir. 1983). See, also, *United States v. Marques*, 600 F.2d 742 (9th Cir. 1979), *cert. denied sub nom., Belcher v. United States*, 444 U.S. 858, 100 S. Ct. 119, 62 L. Ed. 2d 77; *United States v. Gerardi*, 586 F.2d 896 (1st Cir. 1978).

The U.S. Court of Appeals for the Tenth Circuit, in a case very much analogous to the case now before us, wrote:

> We agree with respondent that the district court erred in considering evidence from two jurors who indicated that they would have voted differently had they been given an entrapment instruction. We hold that such evidence is not permitted in a federal habeas proceeding. Fed.R.Evid. 606(b) prohibits juror testimony "to the effect of anything upon that . . . juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith," *id.*, with certain exceptions not here applicable. We have strictly construed Rule 606(b) to prohibit a juror from testifying to the effect of anything upon that juror's mind not within the specified exceptions to the rule. . . . Although Capps attempts to distinguish the instant situation by asserting that the testimony does not attack the verdict or the jurors' deliberations or mental processes, we think the situation is indistinguishable from *Voigt*. By playing a "what if" game with jurors who voted to find him guilty, Capps actually is probing their mental processes in their deliberations and using the results in an attempt to secure a new trial. This he cannot do under Rule 606(b).

*Capps v. Sullivan*, 921 F.2d 260, 262-63 (10th Cir. 1990).

It would be anomalous indeed to hold that a juror could not explain the effect of extraneous material on his or her deliberations but permit a juror to reveal how he or she voted at a given point in those deliberations.

## V. JUDGMENT

Inasmuch as the record fails to sustain any of the convict's summarized assignments of error, we affirm the district court's judgment.

AFFIRMED.

WHITE, J., concurs.