STATE OF NEBRASKA, APPELLEE, V. ALISHA J. OWEN, APPELLANT.
508 N.W.2d 299

Filed November 9, 1993.   No. A-92-866.

John W. DeCamp and Stanford L. Sipple, of DeCamp Legal Services, P.C., for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

SIEVERS, Chief Judge, and CONNOLLY and WRIGHT, Judges.

CONNOLLY, Judge.

This appeal arises from the conviction of the appellant, Alisha J. Owen, on eight counts of perjury under Neb. Rev. Stat. § 28-915 (Reissue 1989). This court has decided a previous appeal in this case. See *State v. Owen*, 1 Neb. App. 1060, 510 N.W.2d 503 (1993) (*Owen I*). Among the matters addressed in *Owen I* was the trial court's denial of Owen's first motion for new trial. The subject matter of this appeal is a second motion for new trial that was filed while *Owen I* was pending before this court. The second motion for new trial was overruled. We affirm.

## I. FACTS

For the factual background of the entire case, we refer the reader to *Owen I*. In this opinion, we review only the facts pertinent to the filing of the second motion for new trial.

Neb. Rev. Stat. § 27-606(2) (Reissue 1989) states that

a juror may not testify as to . . . the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

Section 27-606(2) prohibits a juror's affidavit to impeach a verdict on the basis of jury motives, methods, misunderstandings, thought processes, or discussions during deliberations, which enter into the verdict. *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987). Thus, as we review the facts in the record provided by juror affidavits and testimony, we consider only that evidence which complies with the requirements of § 27-606(2).

Eleven months after her first motion for new trial was overruled in the trial court, Owen filed a second motion for new trial pursuant to Neb. Rev. Stat. § 29-2101 (Reissue 1989) on grounds of newly discovered evidence. The second motion for new trial was based on the following allegations: (1) During

deliberations, jurors read a letter written by Michael Casey and addressed to Owen which suggested that Owen was involved in a plan to capitalize on the Franklin scandal, but the letter had never been received into evidence; (2) on the evening of the first day of deliberations, several jurors defied the explicit instruction of the court and watched the television program "48 Hours," which featured the Franklin scandal as one of several case studies in a program about the controversial nature of child sexual abuse allegations; and (3) after the trial, Troy Boner, a witness for the State who had testified that the sexual abuse allegations made by himself and Owen were false, spoke with Owen's mother on the telephone and told her that he had perjured himself because of fear and pressure.

In support of the second motion for new trial, Owen filed affidavits by two jurors, an alternate juror, Owen's mother, and an employer of relatives of Boner. Owen also filed a transcript and an audiotape of the phone conversation between Boner and Owen's mother and a transcript and videotape of the "48 Hours" program.

### 1. CASEY LETTER

The Douglas County grand jury that indicted Owen for perjury included in its report a finding that Casey, with whom Owen had become acquainted in the fall of 1988, was "a 'con man' passing himself off as an investigative reporter who 'endeavored to uncover the "real" Franklin story,' " *Owen I* at 1065, 510 N.W.2d at 509.

In a letter dated March 15, 1990, and found among Owen's personal papers, Casey wrote to Owen that he was working with producers in Los Angeles and Omaha to develop his "Franklin project" and that he would send Owen a copy of the first draft of a script for a play so that Owen could review it and offer her ideas. The letter also contains the following paragraph:

> "I also know and feel that promises were made — before I ever gave Gary you[r] name and location — he'd assured me that if your info checked out you would receive favorable consideration and protection outside of a prison environment. I feel most responsible if promises were made to you and not kept!"

*Id.* at 1066, 510 N.W.2d at 509-10. In March 1990, Owen was serving a prison term for having passed bad checks. The "Gary" mentioned in the letter apparently was Gary Caradori, a private investigator hired by the Nebraska Legislature to investigate Franklin-related allegations of child sexual abuse.

In a greeting card to Owen dated March 23, 1990, and found among Owen's personal papers, Casey wrote that three national publications and a movie producer were interested in his Franklin project and that Owen was " 'assured of a job when [you] get out of their [sic] as a consultant and researcher.' " *Id.* at 1065, 510 N.W.2d at 509.

Juror John Hurley testified via affidavit and at the hearing on the second motion for new trial that a letter from Casey to Owen had been passed among jurors and read during deliberations. It appears from the record that Hurley was referring to the March 15 letter. Hurley testified that shortly after the trial, Frances Mendenhall, editor of a newspaper called the Nebraska Observer, asked him to pull the Casey letter from the evidence and show it to her. He could recall being in the courthouse but could not recall in which room the encounter with Mendenhall had occurred. Hurley said that he had followed Mendenhall down a hallway and into a room. In the room was a box allegedly containing the evidence from *Owen I.* Hurley could not recall any dealings with court reporters or clerks in obtaining the evidence, nor were any such personnel present in the room where he and Mendenhall "started digging through" the evidence. Hurley had assumed that Mendenhall had obtained permission to examine the evidence. Hurley testified that he was unable to find the Casey letter during this posttrial examination of the evidence.

Owen argues that the Casey letter was "planted" in the jury room during deliberations so that it would come to the attention of the jurors and was then removed from the body of evidence.

## 2. "48 HOURS"
Hurley also testified that he and other jurors had violated the court's prohibition and had watched the "48 Hours" program dealing with the Franklin scandal. Jury deliberations began the

morning of June 19, 1991, and continued throughout the day. The program aired that evening. The jury continued deliberations on June 20 and reached a verdict on June 21.

The brief segment of the program devoted to the Franklin scandal (less than three pages of written copy) consisted mainly of Boner explaining that he had falsely accused prominent Omahans of having sexually abused children. The segment was also interspersed with comments by the person who had borne the brunt of the false accusations.

### 3. BONER'S ALLEGED PERJURY

#### (a) Janecek Affidavit

Robert Janecek, Jr., formerly a law enforcement officer and more recently a private investigator, testified via affidavit that he has known the Boner family for approximately 30 years and that during that time he has employed various members of the Boner family on a part-time basis. Janecek claimed that three relatives of Boner's had told Janecek that Boner had informed the Boner family that he had accepted a $12,000 bribe for lying at Owen's perjury trial. Janecek stated that according to Boner's relatives, he was induced to perjure himself by two means: the threat that he "would never make it to trial" and the promise of a financial reward. Janecek's affidavit does not name the party or parties who allegedly threatened Boner and bought his perjured testimony.

#### (b) Donna Owen Affidavit

Donna Owen, the mother of Alisha Owen, testified via affidavit that Boner phoned the Owen residence after the trial and claimed that he had lied at trial to protect himself. She stated that Boner asserted that "it was impossible for me, Donna Owen, to understand the fear and pressure that he, Troy, was under from the time he had gone to Senator Schmit's office and tried to recant and tell the truth up to and during the trial."

The reference to former State Senator Loran Schmit was an allusion to an incident examined during Owen's perjury trial. Schmit had served as the chairman of the "Franklin Committee," a special ad hoc committee established by the Nebraska Legislature to investigate the Franklin scandal. He

testified at Owen's perjury trial that Boner had come to his State Capitol office shortly after the death of the Franklin Committee's investigator in a plane crash in July 1990. Schmit said that Boner informed him that Boner had told the investigator the truth—that prominent Omahans were running a child sexual abuse ring. While testifying before a Douglas County grand jury impaneled in March 1990 to review allegations related to the Franklin scandal, Boner had recanted the original story of sexual abuse he had told to the Franklin Committee's investigator. Boner told the grand jury that the allegations about a child sexual abuse ring were false. According to Schmit, though, in July 1990 Boner said he had recanted the original story he told to the Franklin Committee's investigator because he had been pressured to do so by members of the FBI.

As was the case with the Janecek affidavit, the affidavit of Donna Owen did not name the party or parties allegedly applying the pressure on Boner. Donna Owen had activated a recording device during the phone conversation with Boner. A transcript and an audiotape of the conversation were admitted into evidence along with Donna Owen's affidavit, but significant portions of the audiotape are unintelligible.

### 4. Judgment on the Motion

Relying on § 27-606(2), Owen argued that the Casey letter and the TV show constituted extraneous prejudicial information improperly brought to the jury's attention. Owen also characterized the reading of the Casey letter in the jury room as improper communication between a nonjuror and the jury. Regarding the alleged perjury committed by Boner, Owen contended that there "would have been no charges [and] no trial" but for Boner's testimony and that the evidence provided by Janecek and Donna Owen indicated that Boner had lied as a witness for the State.

The trial court found that the allegations of prejudicial misconduct concerning the Casey letter and the TV show were "not substantiated by any of the records brought to the attention of the Court." On the Boner issue, the court found that evidence adduced at Owen's perjury trial

indicated that Troy Boner had recanted his story as given to the grand jury, and his instability was clearly brought out to the trial jury. . . .

The purported new evidence as reflected by [the transcript and audiotape of the phone conversation with Donna Owen] does not in the opinion of the Court constitute new evidence but would show a continuing instability on the part of the trial witness Boner . . . .

The motion for new trial was overruled.

## II. ASSIGNMENTS OF ERROR

Owen argues that the trial court erred in refusing to grant a new trial based on (1) the misconduct of the jurors who watched the "48 Hours" segment on the Franklin scandal, (2) the reading of the Casey letter in the jury room, and (3) the posttrial evidence that Boner had perjured himself.

## III. STANDARD OF REVIEW

A motion for new trial made under § 29-2101 on grounds of newly discovered evidence material for the defendant which he could not with reasonable diligence have discovered and produced at trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed on appeal. *State v. Boppre*, 243 Neb. 908, 503 N.W.2d 526 (1993).

Judicial abuse of discretion means that the reasonings or rulings of the trial judge are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991).

## IV. ANALYSIS

### 1. JURISDICTION

■ We first point out that the trial court properly asserted jurisdiction of the second motion for new trial even though a prior motion for new trial was pending before this court when the second motion was filed. In *Smith v. State*, 167 Neb. 492, 93 N.W.2d 499 (1958), the defendant filed a motion for new trial based on newly discovered evidence while the appeal of his conviction was pending before the Nebraska Supreme Court. The Supreme Court set forth the following proposition of law:

"If there are valid grounds for re-examination on the basis of newly discovered evidence to ascertain whether or not a person has been wrongfully convicted[,] the steps provided for such re-examination should be taken timely and without undue delay." *Id.* at 495, 93 N.W.2d at 501. We rely on that same rationale in proceeding with a decision in this appeal even though our decision on the prior motion for new trial is pending before the Nebraska Supreme Court.

## 2. CASEY LETTER

We take judicial notice of the record in *Owen I* pursuant to Neb. Rev. Stat. § 27-201 (Reissue 1989) and note that during Owen's perjury trial exhibits 54 and 55 were offered into evidence *by Owen's attorney* and were received. Exhibit 54 was a bundle of correspondence that had been found in Owen's personal files. Included in the bundle was the March 23 greeting card from Casey. Exhibit 55 also was a bundle of correspondence that had been found in Owen's personal files. The March 15 letter from Casey was included in the exhibit 55 bundle. Therefore, both the letter and the greeting card from Casey were properly before the jurors in the jury room, and this assignment of error is without merit.

## 3. "48 HOURS"

In order for a new trial to be granted because of juror misconduct, the party claiming the misconduct has the burden to show by clear and convincing evidence that prejudice has occurred. *Hunt v. Methodist Hosp.*, 240 Neb. 838, 485 N.W.2d 737 (1992). We also are guided by the following excerpt from *State v. Rife*, 215 Neb. 132, 141, 337 N.W.2d 724, 730 (1983):

During the trial one of the jurors indicated that she had watched a television report [concerning the trial]. The appellant complains that the trial court erred in failing to grant his motion for mistrial based upon this alleged juror misconduct. There is no showing in the record of the content of the television report. . . . In the absence of a showing of prejudice, the trial court was correct in denying the motion for mistrial. Opportunity for prejudice . . . does not raise a presumption that prejudice . . . exists.

Although the passage immediately above dealt with a motion for mistrial rather than a motion for new trial, we believe the rationale applies in the case before us. Thus, Owen bears the burden of proving by clear and convincing evidence that the program prejudicially affected the jurors in reaching their verdict.

The court indicated in *Rife* that the defendant must offer the content of allegedly prejudicial media coverage and also show prejudicial effect. In *State v. Bautista*, 193 Neb. 476, 227 N.W.2d 835 (1975), the court stated that a mistrial should not be granted on grounds that jurors had read newspaper reports of the progress of the trial unless the reports were prejudicial to the defendant. Although in this case we are dealing with a report presented by the electronic media rather than the print media, we apply the rationale of *Bautista* and consider whether the "48 Hours" coverage of the Franklin matter was prejudicial to Owen.

We reject Owen's assertion that because the program was hosted by a nationally known and respected news reporter, the jurors disregarded 5 weeks' worth of evidence and instead convicted Owen in response to the supposed imprimatur bestowed on Boner by the nationally known reporter's indirect influence. (A correspondent other than the nationally known reporter actually prepared and presented the Franklin segment.) Instead, we look to the substance of the report to determine whether there was prejudice to Owen.

The segment on the Franklin scandal essentially consisted of the following: (1) Boner said that he had falsely claimed that prominent men in Omaha had sexually abused children, including himself; (2) a former Omaha chief of police who had been a main focus of Owen's allegations talked about the professional and personal devastation he had experienced because of the allegations; and (3) an Omaha criminal defense attorney not connected with the case described the volatility and destructive potential of allegations of child sexual abuse.

We find that the record does not present clear and convincing evidence of prejudice to Owen resulting from the fact that some of the jurors watched "48 Hours." The following excerpts from the testimony of Hurley are instructive on this point:

[State's attorney:] . . . Mr. Hurley . . . I want you to peruse [the written transcript of the program] and tell me if you see any information disclosed in that 48 Hours program that was not gone over in detail [during the trial].

[Hurley:] I'm sure it was all gone over in the trial.

. . . .

[State's attorney:] . . . You sat for five weeks —

[Hurley:] Yeah.

[State's attorney:] — and listened to over 50 witnesses discuss this case. And you had 400 or more exhibits in the case. So obviously you as a juror saw and heard and observed far more than any five- to ten-minute segment on a television program could ever, ever hope to present; isn't that true?

[Hurley:] Yes, sir.

In substance, Boner's comments on the television program were identical to the statements he had made as a witness at trial. The former chief of police interviewed on "48 Hours" had already testified extensively at trial to the falsity of the allegations against him and their traumatic impact on his life. The comments by the defense attorney about the explosive nature of child sexual abuse allegations certainly were no revelation to jurors who had spent 5 weeks hearing evidence in a highly controversial case implicating prominent citizens and city officials. Although we certainly do not condone the conduct of the jurors who disregarded the court's admonition against watching "48 Hours," we find that the cursory treatment of the subject matter in the television program offered nothing that the jurors had not already heard and considered in much greater detail during the trial. Therefore, we agree with the ruling of the trial court that Owen failed to show that the verdict against her was tainted by prejudice because some of the jurors had watched the Franklin segment on "48 Hours."

### 4. BONER'S ALLEGED PERJURY

Owen argues that a new trial is warranted because the affidavits of Janecek and Donna Owen, and the transcribed and tape-recorded versions of Donna Owen's phone conversation with Boner, constitute newly discovered evidence that

Boner was coerced into committing perjury.

A motion for new trial based on newly discovered evidence may be granted if the new evidence (1) probably would have produced a different result had it been offered and admitted at trial and (2) is relevant and credible, *and not merely cumulative*. *State v. Batiste*, 231 Neb. 481, 437 N.W.2d 125 (1989). See, also, *State v. Boppre*, 243 Neb. 908, 503 N.W.2d 526 (1993).

In this instance, the newly discovered evidence is cumulative. Boner testified at Owen's perjury trial that the allegations of sexual abuse made by himself and Owen were false. Owen presented evidence to the jury that Boner had initially confirmed Owen's allegations of sexual abuse, then recanted before the Douglas County grand jury, and then later told former State Senator Schmit that he had recanted only because of pressure from the FBI. In its ruling on the second motion for new trial, the trial court correctly noted that the issue of Boner's credibility had been thoroughly explored at trial. The jury heard evidence that over the course of the Franklin investigation, Boner seemed to vacillate between two completely different stories of the alleged child sexual abuse ring and his involvement in it. We agree with the trial court that the newly discovered evidence presented by Owen on the matter of Boner's alleged perjury proves nothing new, but, instead, merely reiterates the fact that Boner is unstable. The fact that Boner once again may have changed his story on the Franklin scandal is not surprising. Six months from now Boner may well change his story again. At this point in the proceedings, evidence of further vacillation by Boner concerning the Franklin allegations is cumulative and is of no probative value.

## V. CONCLUSION

We find no grounds to support Owen's second motion for new trial. The Casey letter was part of the record properly before the jury. The "48 Hours" segment on the Franklin scandal barely skimmed the surface of the case and presented information that had received exhaustive attention during the trial. The question of whether Boner was coerced into betraying Owen and lying as a witness at her perjury trial was raised at

trial. There is no justification in the record for revisiting that question. For these reasons, we affirm the judgment of the trial court overruling Owen's second motion for new trial.

AFFIRMED.