THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES WILLIAMS *et al.* Plaintiffs in Error.

*Opinion filed October 26, 1909—Rehearing denied Dec. 8, 1909.*

1. CRIMINAL LAW—*what does not justify a conviction for robbery.* Mere proof that one of the two defendants charged with robbing the prosecuting witness of his purse on a crowded street car was one of the men who "backed" the prosecuting witness from the car door to the platform is not sufficient to justify his conviction, in the absence of any proof that he acted with the intent to aid the other defendant in securing the purse, or that there was any conspiracy or concerted action between them or even any acquaintance with each other prior to the robbery.

2. SAME—*what constitutes sufficient identification.* Testimony by the prosecuting witness in a robbery case that he had a good look at the man who took his purse and that the defendant was that man, coupled with the fact that such defendant was picked out by the prosecuting witness, three weeks after the crime, from among a crowd of 2500 men and pointed out to the police as the robber, is sufficient to justify a verdict of conviction as against the testimony of two witnesses who saw the robber some distance from them, running from the scene of the crime, who testified that the defendant was not that man.

3. SAME—*what must appear to justify a new trial for newly discovered evidence.* To justify allowing a new trial for newly discovered evidence the evidence must be such as will probably

change the result; it must have been discovered since the trial, and be such as could not have been discovered before the trial by the exercise of due diligence, and it must be material to the issues and must not be merely cumulative to that offered on the trial.

4. SAME—*applications for new trial for newly discovered evidence must be closely scrutinized.* In order to prevent, as far as possible, fraud and imposition which defeated parties may be tempted to practice as a last resort to escape the consequences of an adverse verdict, applications for a new trial on account of newly discovered evidence must be closely scrutinized by the court.

5. SAME—*forgotten facts are not, strictly speaking, newly discovered.* While it may be that in a sense a forgotten fact is the same as if it had never been known, yet the liability to fraud and the temptation to perjury forbid that a new trial shall be granted because the party against whom a verdict has gone makes oath that he had forgotten the material part of his evidence.

6. SAME—*what is not ground for new trial.* An affidavit by a convicted person, supported by the affidavits of a doctor, a nurse and another witness, to the effect that such person, at the time of the crime, was three miles away at the bedside of his sick wife, does not warrant a new trial as for newly discovered evidence, where the arrest, trial and conviction were had within a month from the commission of the offense, and the only excuse for not producing the evidence on the trial is that defendant had forgotten his whereabouts on that day and did not think to inquire of the doctor and nurse, though he inquired of numerous other persons who could not testify to his whereabouts or refresh his memory.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

STEDMAN & SOELKE, and ARTHUR J. SHUTAN, for plaintiffs in error.

W. H. STEAD, Attorney General, and JOHN E. W. WAYMAN, State's Attorney, (ROY WRIGHT, and W. A. RITTENHOUSE, of counsel,) for the People.

Mr. JUSTICE VICKERS delivered the opinion of the court:

The plaintiffs in error, Charles Williams and Edward Jackson, (who is also known as Edward Jacobson,) were indicted by the grand jury of Cook county, tried and con-

victed of the larceny of $460 lawful money, the property of David M. Moses.

The only evidence introduced on behalf of the People was the testimony of David M. Moses, the prosecuting witness. His evidence, in substance, is as follows: He testified that he was engaged in the real estate business in San Francisco, California; that he arrived in Chicago about seven o'clock on the morning of January 25, 1909, having come from St. Paul on the Chicago, Milwaukee and St. Paul train which left St. Paul between seven and eight o'clock the evening before. He testifies that about five minutes before the Union station was reached in Chicago an agent of the Parmelee Transfer Company came through the Pullman car on which Moses was traveling, looking after baggage to be transferred; that Moses gave the agent a check for a trunk, with directions to transfer the trunk to the Auditorium Annex, where he intended to stop; that in getting his check from his purse he displayed to said agent several one hundred dollar bills; that he put his purse back in his left hip-pocket and buttoned the flap of the pocket; that after arriving at the station Moses left the car and walked from the depot to the corner of Adams and Canal streets, where he waited for a street car. He was carrying a grip, an umbrella and a cane. He had on a frock coat and an overcoat, both of which were buttoned. He states that there were a number of people,—a dozen, more or less,—standing near him waiting for the car. At this time he testifies that he noticed a man standing pretty close to him and that he obtained a good look at him. When the street car arrived Moses waited until all of the persons got aboard except himself and this party whom he had noticed. He says he stepped aside and beckoned for the man to get on the car, and that the party stepped aside and made a motion with his hand for Moses to get on first, and that he, acting on this invitation, attempted to get on the car; that as he raised his hand to take hold of the

brace and placed one foot on the lower step, and as he was in the act of stepping upon the rear platform, he felt a tug at his coat or pocket behind him; that he thought the man in his rear had pushed him with an umbrella, but upon turning around he discovered that the only party behind him had no umbrella in his hand. Moses states that he obtained a good look at the man behind him and saw him full in the face; that he gave him a hard look, and noticed that he had some sort of a defect about his nose and that two of his front teeth were separated by an unusually wide space; that the witness again took hold of the stanchion or hand-rail of the car and attempted to step upon the platform, and while doing so he again felt the tugging at his clothing behind him; that he succeeded in releasing himself and got upon the platform and rushed into the car to get away, and that when he got inside of the entrance two men in front of him,—one on each side,—backed him out toward the door and on to the rear platform. The witness does not state, nor does any of the evidence show, which way the men were facing who backed him out on the platform. Moses uses the expression, "Two men backed up,— one on each side,—and forced me out on the platform and to the left side of the platform." He gives no definite description of their movements. He does say, however, in his cross-examination, that he did not get a good look at anyone on the car except the man who was tugging at his clothing. About the time that Moses reached the rear platform he felt in his pocket and discovered that he had been robbed. He immediately called to the conductor to stop the car and said he had been robbed. As the car slowed up to stop, a man jumped off the rear platform and ran down the street in the opposite direction from the way the car was going. Moses jumped off the car and chased the party, being something like one hundred to one hundred and fifty feet behind him. The prosecuting witness left his grip on the street car, and after he had started

chasing the man someone on the car called to him, saying, "You have left your grip on the car." The man Moses was chasing made his escape. While Moses was chasing the party they passed two cab drivers, Jensen and Dunbar, both of whom saw Moses and the man he was pursuing as they ran by them at a distance of about fifteen feet. Moses reported to a policeman that he had been robbed and gave a description of the man whom he had chased from the car. Moses afterwards recovered his grip, and in the afternoon his purse was brought to him, having been found by a postman in a mail box. He was shown a large number of photographs at the Randolph street station, and it appears that the pictures of plaintiffs in error were both in the book of photographs, but the prosecuting witness was unable to identify either of them from an examination of their pictures. Mr. Moses remained in Chicago about ten days, during which time he made an unsuccessful effort to find the parties who had robbed him. He then went east, telling the police that if they located any suspected parties he would return to Chicago at any time when requested. About the 13th or 14th of February Mr. Moses, in response to a telegram, returned to Chicago. Plaintiffs in error had been arrested. Plaintiff in error Williams was placed in a room with fifteen or sixteen other men, and Moses identified Williams as one of the men who shoved him out on the platform of the car. Plaintiff in error Jackson was required to pass a certain point where a large number of other persons were passing. Moses was stationed at a place where he could see all the persons that passed. About 2500 men passed Moses when Jackson appeared, and Moses immediately identified him by the peculiarity of his nose and pointed him out to the police as the man whom he had chased from the car.

The foregoing is the substance of all of the evidence introduced on behalf of the People. On behalf of plaintiffs in error it was shown by a policeman that Moses had

failed to identify the pictures of plaintiffs in error, and that when shown a large number of photographs he said that a picture of a man by the name of Graves resembled Jackson more than any picture that he had seen, and that he said that the picture of a man by the name of Kershaw had some resemblance to one of the men who had shoved him, but he told the police that he would not be able to swear positively to anyone from merely seeing a picture. William Dunbar and J. C. Jensen, both of whom saw the man Moses chased from the car, testified that Jackson was not that party; that they had seen the man who ran from the car once since the morning of the robbery, near the same place, and that they made an effort to have him arrested but he got away before they could secure a policeman. Neither of plaintiffs in error testified on the trial.

The foregoing is the substance of all of the evidence that was offered on the trial. Plaintiffs in error contend that this evidence is not sufficient to warrant a verdict of guilty. There is no proof that Williams and Jackson had any acquaintance with each other prior to the time of the robbery. It is argued that Williams is the man that called to Moses and told him he had left a grip on the car, and that this was done to divert his attention and enable Jackson to make his escape. There is no one who swears that Williams is the man who used this language to Moses. It is a mere inference that is not supported by any evidence. The statement that two men backed the prosecuting witness out of the aisle on to the rear platform and that Williams was one of these men is all the evidence in the record which in any way tends to connect Williams with this offense. This, in our opinion, is insufficient to warrant a finding that Williams and Jackson were co-operating together for the purpose of robbing the prosecuting witness. The street car was crowded and there were a dozen or more persons got on the car at the same time Mr. Moses got aboard. It is not shown that Williams boarded the car at that place. No

one testifies where Williams got on the car. There is not a scintilla of evidence to show that Williams and Jackson had entered into any conspiracy or that they had any previous association or acquaintance with each other. The mere jostling of the prosecuting witness so that he was compelled to stand out on the platform, in view of the crowded condition of the car, may have aided Jackson in obtaining the money, but in order to support a verdict of guilty on the theory that Williams was aiding and abetting, it ought to appear that the act of Williams was done with an intent on his part to aid Jackson in committing the offense. Waiving all question as to the identity of Williams and assuming that he did all Moses swears to, still we think that this act is not so inconsistent with his innocence as to warrant a verdict of guilty against him. In addition to this, if the men who jostled Moses on the car had their backs toward him his opportunity to identify either of them would be unfavorable.

In reference to the case against Jackson the evidence of his identity is reasonably satisfactory. Mr. Moses swears that he had a fair view of Jackson's face. He looked at him before they got on the car, and when he attempted to get on the car and Jackson pulled at his pocket he turned around and again looked him square in the face and discovered the peculiarities about his nose and teeth already referred to. It is shown that he identified Jackson among 2500 others without hesitation when he next saw him. It is true that Jensen and Dunbar both testify that Jackson is not the man whom Moses chased from the car, but their opportunities for seeing and observing the features of the party were not as good as Moses had. They only saw him at a distance of some fifteen feet while he was running past them. We think that the jury were justified in believing the testimony of Moses as to the identity of Jackson and that the verdict as to him should not be set aside as being against the evidence.

On behalf of plaintiff in error Jackson it is strenuously contended that he should have been granted a new trial on the ground of newly discovered evidence. This contention is based upon the affidavits of Jackson, Dr. Joseph S. Pigall, Bessie Burkett, Edward Kane, and attorneys Charles Erbstein and Frank Bowen, who defended Jackson in the court below. In his own affidavit Jackson swears that since his trial and conviction he has discovered that he was at his home, No. 142 Francisco street, in the city of Chicago, a distance of three miles from the place where the alleged offense was committed, during all of the forenoon of January 25, 1909, and that he can prove his presence at home by Dr. Joseph Pigall, Bessie Burkett and Edward Kane. He testifies that after he was arrested and charged with this offense he was unable to remember where he was on the morning the offense was committed; that he has a poor memory for associating events with particular dates, and that while he knew the events which occurred at his house on that day happened, he was not able to connect them with the 25th of January; that after he was convicted Bessie Burkett called his wife's attention to the fact that it was on the morning of the 25th of January, 1909, that Mrs. Jackson was seriously ill, and that said Burkett, Dr. Pigall and Kane were at his house on that day and would testify that Jackson was at home on the morning that the alleged offense was committed. He states in his affidavit that he made inquiry of various persons, several of whom are named by him, and that he was unable to find anyone who could testify where he was on the morning in question or refresh his memory so that he would be able to give an account of his whereabouts at the time in question. His attorneys testify that they made frequent inquiries of plaintiff in error for the purpose of ascertaining where Jackson was at the time the alleged robbery occurred and that they were wholly unable to learn anything from Jackson on that

subject, owing to his inability to remember anything respecting his whereabouts on the morning of January 25.

Dr. Pigall states that he is a regularly licensed physician and has been practicing medicine in Chicago for seventeen years last past and that he has been during the last year a member of the staff of the West Side Hospital; that he is the regular family physician of Nettie Jackson, wife of plaintiff in error, and has repeatedly treated her in the past; that he was called to treat her at her home, No. 142 Francisco street, in Chicago, on January 23, 1909, and also on the 24th and 25th of January; that on the morning of the 25th he was called to attend Mrs. Jackson and arrived at her home about 6:30 in the morning; that he found Mrs. Jackson very ill and suffering great pain; that he remained constantly with Jackson's wife until about eight o'clock of said morning, during which time Mrs. Jackson suffered a miscarriage; that plaintiff in error Jackson was at home attending upon his sick wife during the whole of the time that the doctor was there; that he kept a record of his visits, and that such record shows the day and date of each visit and the length of time spent in his attendance; that from his books and his recollection he is able and willing to state, under oath, that plaintiff in error Jackson was at his home during the time above stated, and that Bessie Burkett and Edward Kane were also at the Jackson home during the time covered by Dr. Pigall's affidavit.

Bessie Burkett states in her affidavit that she is well acquainted with the Jackson family and that she was at the Jackson home on the evening of January 24, 1909; that Mrs. Jackson was very sick; that she requested Mrs. Burkett to stay over night with her but that she was unable to do so on account of her presence being required at her own home; that she promised to return early the following morning, and did so return, arriving at the Jackson home before seven o'clock; that she found Dr. Pigall there and that he remained until about eight o'clock. She cor-

roborates Dr. Pigall as to the nature of Mrs. Jackson's illness, and states that she remained with Mrs. Jackson until about eleven o'clock in the forenoon of said 25th day of January, and that plaintiff in error Jackson was at home during all of the time that Mrs. Burkett was there.

Edward Kane states in his affidavit that he called at the Jackson home about seven o'clock on the morning of the 25th to see Jackson on business connected with securing employment for Jackson; that when he arrived there he found Jackson's wife critically ill; that he remained at the Jackson house until about eight o'clock, and that Jackson was at home during that time.

Applications for a new trial on the ground of newly discovered evidence, in order to justify its allowance, should fulfill the following requirements: (1) The evidence must appear to be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; and (5) it must not be merely cumulative to the evidence offered on the trial. Strictly speaking, the evidence offered does not come within the class of newly discovered evidence. The most that can be said of it is, that it is evidence of facts which were known to Jackson but which he claims to have forgotten. This offense was committed on the 25th of January. Jackson was arrested on the 13th or 14th of February following, was indicted on the 17th, put upon trial on the 18th, trial was concluded on the 24th and a verdict of guilty was returned on the 25th. It will thus appear that plaintiff in error was charged with this offense in less than three weeks after its commission and that he was indicted, tried and convicted within a month. It is difficult to believe, with so serious a charge as this made against him, that he never inquired of the physician and nurse who were attending his wife at that time as to their recollection of his where-

abouts on the morning of the 25th. The most reasonable and natural thing for him to do would be to inquire among persons who he knew were at his house at that time, to find out what they would be able to testify to with reference to his presence at home on the morning of the 25th of January. He states in his affidavit that he made inquiry of various persons, but it is not shown what reason he had to believe that any of the persons of whom he made inquiry would know anything concerning his whereabouts at the time in question. No one claims that any of the persons inquired of were at the Jackson residence on the morning of the offense. It seems strange that he should ask eleven men, none of whom knew anything about where he was and had no means of knowing, and yet omit to ask the persons who were at his home and had knowledge of the facts which he desired to prove. In our opinion the affidavit of Jackson fails to show proper diligence on his part to obtain the testimony of these witnesses at his trial, and we also are of the opinion that the evidence cannot be classed as newly discovered evidence.

It would be a dangerous rule to grant a new trial upon an *ex parte* statement that certain material facts which had previously been known had been forgotten. It may be that in a sense a forgotten fact is practically the same as if it had never been known, but the liability to fraud and the temptation to perjury in such cases forbid that a new trial should be granted because the party against whom a verdict has gone makes oath that he has forgotten material parts of his evidence. In order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice as a last resort to escape the consequence of an adverse verdict, applications for new trial on account of newly discovered evidence should always be subjected to the closest scrutiny by the court. The rules of law which govern in such cases, if carefully observed, will generally accomplish justice. There is, of course, a bare possibility

that a rigid adherence to these rules may in exceptional cases work an injustice, but this is unavoidable. Neither the law nor the means of enforcing it are infallible, nor are the methods appointed by the law for the discovery of truth and the detection of error immune from mistakes; but it is far better that a single person should suffer mischief than that the rules be so relaxed that every litigant will have it within his power, by keeping back part of his evidence and then swearing that it was forgotten, to destroy a verdict and obtain a new trial at his pleasure. We are satisfied with this verdict as to Jackson upon the evidence. He does not bring himself within the requirements of the law entitling him to a new trial on account of the alleged newly discovered evidence.

The judgment will therefore be affirmed as to Jackson, but as to Williams the judgment will be reversed and the cause, as to him, remanded.

*Judgment reversed in part and cause remanded.*