STATE OF NEBRASKA, APPELLEE, V. DANIEL ORLIN HIRSCH, SR., APPELLANT.

511 N.W.2d 69

Filed January 28, 1994.   No. S-92-611.

Glenn A. Shapiro, of Gallup, Schaefer, Riha, Dornan, Jabenis & Shapiro, for appellant.

Don Stenberg, Attorney General, and Kenneth W. Payne for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

Following the overruling of the demurrer filed by the defendant-appellant, Daniel Orlin Hirsch, Sr., on the ground that the charge was time barred, the district court, pursuant to verdict, adjudged Hirsch guilty of committing first degree sexual assault on his daughter, in violation of Neb. Rev. Stat. § 28-319 (Reissue 1989). Hirsch appealed to the Nebraska Court of Appeals and assigned as errors the district court's failure to (1) sustain his demurrer, (2) grant his motion for a directed verdict, and (3) order a new trial because of the discovery of new evidence. The Court of Appeals determined that the district court had indeed erred in failing to sustain Hirsch's demurrer, vacated the judgment of the district court, and remanded the cause with the direction that it be dismissed. The plaintiff-appellee State then successfully petitioned this court for further review. We reverse the judgment of the Court of Appeals and remand the cause with the direction that the judgment of the district court be reinstated.

## II. FACTS

Hirsch, who was born on February 27, 1948, married in 1973. The marriage produced two children, a son and a daughter who was born August 27, 1977. At his wife's request, Hirsch left the family home prior to the time of the alleged assaults and was living with a friend. The wife petitioned for dissolution of the marriage, and the court granted Hirsch overnight visitations, which took place at Hirsch's residence. Although Hirsch testified that he, his son, and his daughter all slept in separate rooms, the daughter testified that the son slept in Hirsch's room and that she and Hirsch slept in the guest room. The son testified that sometimes Hirsch and the daughter would sleep in the same room, one of them on the air mattress and the other in the bed.

The daughter testified that during one of her overnight visits, just before she entered Lutheran General Hospital in July 1986, she was lying on the air mattress, and Hirsch asked her if she wanted to come sleep with him. When she refused, Hirsch told her "to take off all [her] clothes and get into bed with him."

She testified that she got into bed with Hirsch because he had told her that if she did not, "he'd spank [her], and if [she] ever told anybody what he had [her] do that he'd kill [her]," her mother, or her brother. She stated that Hirsch touched her vagina with his finger and it started to hurt a little bit.

Dr. Roger Parolini admitted the daughter to the hospital for suicidal tendencies on July 28, 1986, and concluded she was having an adjustment disorder with a depressed mood. In the history prepared for the daughter's hospitalization, Parolini referred to a previous episode of suicidal ideation the daughter had suffered approximately a year earlier.

According to the daughter, a second incident of abuse occurred just before she was hospitalized a second time, on November 26, 1986. Again, Hirsch asked her if she wanted to sleep with him and she refused. Hirsch then told her to sleep with him and take off all her clothes. The daughter testified that the same thing that had happened the first time happened again. Hirsch started touching her with his finger and then got on top of her with his legs around her. She started to feel a "really bad pain" that was "up inside [her]," in her vagina. The daughter described an "egg yolk feeling" that she felt between her legs. Hirsch again threatened that if she ever told anybody, he would kill her or her mother or brother.

The daughter testified that around Christmas, Hirsch again asked her if she wanted to sleep with him. When she refused, he told her to come sleep with him and take off all her clothes, threatening to spank her if she did not do it and threatening to kill her, her brother, or her mother if she told anybody. The daughter complied. Hirsch started touching her with his hands and got on top of her again. The daughter testified she "hurt and . . . hurt . . . hurt inside" and then she got away, first running into her brother's room and then sleeping all night in the bathroom.

The daughter also testified that she and Hirsch took showers together while she was in the first through third grades. Hirsch would wash her in the shower, but she did not have to wash him. Erma Ballenger, the daughter's social worker and primary therapist at Charter Hospital, where the daughter was admitted a third time on July 8, 1987, reported that the daughter said that

Hirsch had had her wash his private parts. Latisha LaRock Mullen, a nurse and member of the sexual abuse clinic, interviewed the daughter after Ballenger reported the sexual abuse and also testified that the daughter said she had been forced to wash Hirsch's genital area.

The wife testified that she caught the daughter and Hirsch coming out of the shower and had made "a big deal out of it" because she thought the daughter was too old to be taking showers with Hirsch. Hirsch admitted showering with his daughter but said that it had only happened once when she was in kindergarten, when they had gotten out of the swimming pool and were going out somewhere, and that he had his bathing suit on at the time.

The wife first became suspicious during an overnight mother-daughter camp that her daughter might have been sexually abused. The daughter would not join the circle of campers and was standing off by herself. When the wife asked the daughter to join the other campers, the daughter answered that she did not want to because she was "different" and felt "dirty."

The wife also stated that for a period of about 2 years, Hirsch slept in the daughter's bed quite often, which concerned her. When interviewed by Mullen, the daughter told her that Hirsch would fondle her private area during those incidents. Hirsch testified that he slept with his daughter when she was 2 or 3 years old because she was a bed wetter and he would have to wake her at midnight or 1 a.m. He stated he was fully clothed and would return to his own bed after he got her up and returned her to bed.

On January 6, 1987, the daughter began "spotting, bleeding vaginally," and the wife took her to Dr. Mary Lou Flearl, a pediatrician. Flearl testified that she was told this had occurred four or five times, and the daughter complained of a little pain with urination. Flearl noticed that there was redness between the daughter's vagina and rectum which was inflamed and abraded looking, and determined that it was recent, occurring between December 31 and the date of her examination. Flearl could not be specific as to the causes of the spotting, but was sure that the daughter was not bleeding internally.

There was no evidence presented that the daughter had ever fallen or had suffered a straddle injury to her genital area, and both the wife and daughter denied the daughter ever incurred such an injury.

Both the daughter and the wife testified that during the divorce and specifically the fall and winter of 1986, the daughter did not want to visit Hirsch but went because the wife made her go. The wife also testified that immediately before she had the daughter hospitalized the first time, the daughter had returned home from a weekend visitation with Hirsch and began crying and threatening to kill herself.

Hirsch denies ever touching his daughter in a sexual way or attempting to penetrate her. He testified that during the divorce, he had attempted to get custody of both children, and tried again in April 1987, when he was refused visitation with his daughter. Prior to the wife's filing for divorce, she had asked Parolini and another counselor if they would report charges against Hirsch for child abuse. And when the custody and visitation disputes were ongoing, the wife, through her attorney, told Hirsch that she would not pursue criminal prosecution against him if he would not visit his children until they graduated from high school.

Part of the treatment during the daughter's hospital stays was aimed at her attention-seeking and manipulation of others to get her way. On cross-examination, the wife testified that the school psychologist had told her the daughter, as early as 1985, was having trouble with attention-seeking behavior. However, Ballenger testified she did not have a sense that the daughter's claims of sexual abuse were an attempt at manipulation, nor was there any evidence that the daughter was hallucinating or fantasizing.

The testimony also disclosed several instances of sexual behavior on the part of the daughter. The wife described an instance during which the daughter had her shorts off and placed a pencil between her legs. In another, the daughter had been told to get dressed because Hirsch was coming to pick her up for visitation. When Hirsch arrived, the daughter lay down on the couch and, wearing nothing else, "pulled her nightgown up above her waist . . . spread her legs, started playing with

herself and said, 'I love you, Daddy.' " In a third instance, the daughter had tried to get a "little" male friend "to lay down on the bed with her." An entry in the records of the daughter's first stay in the hospital described her as asking the male staff for much attention and being directed to "keep her legs together and her skirt pulled down." During this hospital visit, the daughter was described as "a bit more flirtatious, a bit more sexually oriented" than would be expected for her age.

Dr. William C. Bruns, who performed initial examinations for her first and second hospital visits, testified that the daughter's "hypersexual behavior" is compatible with an abuse experience. In addition, Dr. James Monteleone, who examined the daughter in November 1987 as the result of the hospital's call reporting child abuse, testified that public masturbation is a strong indicator of a need for anxiety release—a call for help and an indication of previous sexual stimulation.

Hirsch points to the fact that the daughter's genital examinations at the hospital prior to her being admitted were reported as normal. However, according to the hospital's examining physician, those examinations are not of the type one would think of in terms of a female genital examination.

Monteleone, on the other hand, found abnormalities indicating that the daughter had been vaginally penetrated, although he could not tell what had penetrated her. He was fairly certain, however, that the penetration was not caused by any type of impaling injury. Further, Monteleone was unable to put a date on when the penetration occurred, but testified the injury could have been up to 2, 3, or 4 years ago. It was his expert opinion that the daughter had been sexually abused.

Hirsch testified that when he visited his daughter during her visits to the hospital, she was ecstatic to see him. He also produced drawings made by the daughter while in the hospital which displayed words like "I love you, Daddy." The daughter testified that she was not really sure if she wanted to see him or not but knew that she was safe at the hospital.

## III. ANALYSIS

With that factual background, we turn our attention to the legal analysis of the issues presented.

## 1. Demurrer

In the first assignment of error, Hirsch asserts that the district court mistakenly failed to sustain his demurrer on the ground that the prosecution was time barred.

### (a) Period of Limitations

The State filed its information against Hirsch on February 27, 1991, and alleged that he had sexually penetrated his daughter "on or about the 25th day of August, 1986 through the 31st day of December, 1986 . . . ." Prior to August 25, 1989, the crime was subject to a 3-year period of limitations. See Neb. Rev. Stat. § 29-110 (Reissue 1985). Through 1989 Neb. Laws, L.B. 211, codified as § 29-110 (Reissue 1989), the Legislature increased the period of limitations to 5 years, but said nothing about retroactive application. As the Legislature did not declare an emergency and adjourned on May 24, 1989, the new 5-year period of limitations became effective August 25, 1989. See Neb. Const. art. III, § 27.

While we have not heretofore established a rule regarding the application of an extended statute of limitations in a criminal case, we have consistently held that the Legislature has the authority to change statutes prescribing the period of limitations to actions. See, *Givens v. Anchor Packing*, 237 Neb. 565, 466 N.W.2d 771 (1991); *Cedars Corp. v. Swoboda*, 210 Neb. 180, 313 N.W.2d 276 (1981); *Grand Island School Dist. #2 v. Celotex Corp.*, 203 Neb. 559, 279 N.W.2d 603 (1979); *Educational Service Unit No. 3 v. Mammel, O., S., H. & S., Inc.*, 192 Neb. 431, 222 N.W.2d 125 (1974). However, once an offense becomes barred, a later statute extending the period of limitations cannot revive the offense.

> For the state to assure a man that he has become safe from its pursuit, and thereafter to withdraw its assurance, seems to most of us unfair and dishonest. But, while the chase is on, it does not shock us to have it extended beyond the time first set, or, if it does, the stake forgives it.

*Falter v. United States*, 23 F.2d 420, 426 (2d Cir. 1928), *cert. denied* 277 U.S. 590, 48 S. Ct. 528, 72 L. Ed. 1003. See, *Tyson v. Johns-Manville Sales Corp.*, 399 So. 2d 263 (Ala. 1981); *Givens, supra*; *United States v. Reina*, 242 F.2d 302 (2d Cir.

1957), *cert. denied sub nom.*, *Moccio v. United States*, 354 U.S. 913, 77 S. Ct. 1294, 1 L. Ed. 2d 1427, *reh'g denied* 355 U.S. 852, 78 S. Ct. 9, 2 L. Ed. 2d 61; *Grand Island School Dist. #2, supra*; *Educational Service Unit No. 3, supra*; *Com. v. Guimento*, 341 Pa. Super. 95, 491 A.2d 166 (1985).

The rationale behind the rule is grounded upon the prohibition of ex post facto laws. See, U.S. Const. art. I, § 10; Neb. Const. art. I, § 16; *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986), *cert. denied* 484 U.S. 872, 108 S. Ct. 206, 98 L. Ed. 2d 157 (1987).

An ex post facto law is one which alters the situation to the disadvantage of an accused. *Weaver v. Graham*, 450 U.S. 24, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981); *In re Estate of Rogers*, 147 Neb. 1, 22 N.W.2d 297 (1946); *State v. McCoy*, 87 Neb. 385, 127 N.W. 137 (1910); *Marion v. State*, 20 Neb. 233, 29 N.W. 911 (1886). Application of a statute of limitations to revive a barred prosecution would disadvantage the accused who has acquired a vested right to be free from suit and, therefore, violates the constitutional prohibition against ex post facto legislation. *Doe v. Roman Catholic Diocese*, 862 S.W.2d 338 (Mo. 1993).

However, extending a statute of limitations which has not yet run does not violate the ex post facto clause. *State v. Creekpaum*, 753 P.2d 1139 (Alaska 1988); *Commonwealth v. Bargeron*, 402 Mass. 589, 524 N.E.2d 829 (1988); *State v. Parker*, 119 Or. App. 105, 849 P.2d 1157 (1993), *review denied* 317 Or. 584, 859 P.2d 541 (1993); *State v. Dufort*, 111 Or. App. 515, 827 P.2d 192 (1992); *State v. Casaretto*, 818 S.W.2d 313 (Mo. App. 1991); *People v Russo*, 185 Mich. App. 422, 463 N.W.2d 138 (1990), *aff'd in part, rev'd in part* 439 Mich. 584, 487 N.W.2d 698 (1992); *Scharfschwerdt v. Kanarek*, 553 So. 2d 218 (Fla. App. 1989), *review denied* 563 So. 2d 633 (Fla. 1990); *State v. Nagle*, 226 N.J. Super. 513, 545 A.2d 182 (1988).

Thus, the question is whether the prosecution of the sexual assaults alleged to have taken place between August 25 and December 31, 1986, was barred before the new 5-year period of limitations became effective.

The period of time within which an act is to be done in any action or proceeding is to be computed by excluding the day of

the act, event, or default after which the designated time begins to run. Neb. Rev. Stat. § 25-2221 (Reissue 1989); *State v. Jones*, 208 Neb. 641, 305 N.W.2d 355 (1981). The word "year" has been legislatively defined to mean calendar year. Neb. Rev. Stat. § 49-801 (Reissue 1988).

Considering the 3-year period of limitations as a period of 3 calendar years, and excluding the first day of the assaults alleged to have taken place sometime from August 25 to December 31, 1986, the statute of limitations expired at the earliest on August 25, 1989, the same day as the amendment extending the period of limitations to 5 years became effective, and at the latest on December 31, 1989. See *George P. Rose Sodding & Grading Co. v. Dennis*, 195 Neb. 221, 237 N.W.2d 418 (1976) (excluding September 5, 1969, the last day on which work was done, the last day of the 4-year period of limitations was September 5, 1973).

(b) Application of Period of Limitations

In *Chicago, B. & Q. R. Co. v. State*, 47 Neb. 549, 66 N.W. 624 (1896), *aff'd* 170 U.S. 57, 18 S. Ct. 513, 42 L. Ed. 948 (1898), the railroad challenged a charter provision authorizing the city to require railroad companies to construct and keep in repair viaducts over streets crossed by their tracks. The railroad argued that the provision had a prospective operation only and did not apply to viaducts in existence at the time the provision took effect. We rejected the railroad's definition of a retrospective law, ruling that a statute does not operate retroactively from the mere fact that it relates to antecedent events. We defined a retrospective law as "one intended to affect transactions which occurred, or rights which accrued, before it became operative as such, and which ascribes to them effects not inherent in their nature in view of the law in force at the time of their occurrence." *Id.* at 564, 66 N.W. at 627. We thus held that the language employed in the statute included such viaducts as were then in existence.

Other jurisdictions have held that an amendment to a statute of limitations enlarging the unexpired period of time within which an action can be brought is not retroactive legislation, but, rather, is considered prospective in its operation. See, *Doe*

*v. Roman Catholic Diocese, supra* (retrospective laws are those laws which take away or impair a right acquired under existing laws or create new obligation, impose new duty, or attach new disability with respect to transactions or considerations already past); *State v. O'Neill,* 118 Idaho 244, 796 P.2d 121 (1990) (to find otherwise would require the court to hold that the violation of a statute by an individual conferred upon that individual, at the time of the violation of statute, a bundle of rights which included the then statute of limitations, which rights were vested at the time of the violation of the statute and could not be altered or amended by the legislature); *Nichols v. Wilbur,* 256 Or. 418, 473 P.2d 1022 (1970) (not retrospective in application but merely an extension of the right to bring the action); *Clements v. United States,* 266 F.2d 397 (9th Cir. 1959), *cert. denied* 359 U.S. 985, 79 S. Ct. 943, 3 L. Ed. 2d 934 (amendment extending statute of limitations not retroactive in substance or effect); *Bear Lake Irrigation Co. v. Garland,* 164 U.S. 1, 17 S. Ct. 7, 41 L. Ed. 327 (1896) (quoted in dicta in *Denver Wood Products Co. v. Frye,* 202 Neb. 286, 275 N.W.2d 67 (1979): provision enlarging time in which to commence action to foreclose lien is not retroactive). See, also, *Brookins v. Sargent Industries, Inc.,* 717 F.2d 1201 (8th Cir. 1983) (general rule in Nebraska is that statutes are not to be given retroactive effect unless Legislature has clearly expressed contrary intention; however, exceptions are recognized for procedural legislation); *State v. Dufort,* 111 Or. App. 515, 827 P.2d 192 (1992); *People v Russo,* 185 Mich. App. 422, 463 N.W.2d 138 (1990), *aff'd in part, rev'd in part* 439 Mich. 584, 487 N.W.2d 698 (1992); *People v Chesebro,* 185 Mich. App. 412, 463 N.W.2d 134 (1990) (exception to general rule that statutes are presumed to operate only prospectively unless the contrary intent is shown by the legislature exists when a statute is remedial or procedural in nature). Contra, *State v. Hersch,* 445 N.W.2d 626 (N.D. 1989), *appeal after remand* 467 N.W.2d 463 (N.D. App. 1991); *State v. Tidwell,* 775 S.W.2d 379 (Tenn. Crim. App. 1989).

We have consistently held that a statute of limitations does not impair existing substantive rights but merely affects the procedure by which such rights may be enforced. *Abboud v. Lakeview, Inc.,* 223 Neb. 568, 391 N.W.2d 575 (1986), *appeal*

*after remand* 237 Neb. 326, 466 N.W.2d 442 (1991); *Cedars Corp. v. Swoboda*, 210 Neb. 180, 313 N.W.2d 276 (1981). Statutes of limitations generally apply to all proceedings commenced after the statute becomes effective, whether rights accrued before or after such date. *Cedars Corp. v. Swoboda, supra*; *Denver Wood Products Co., supra*; *Educational Service Unit No. 3 v. Mammel, O., S., H. & S., Inc.*, 192 Neb. 431, 222 N.W.2d 125 (1974). See, also, *Givens v. Anchor Packing*, 237 Neb. 565, 466 N.W.2d 771 (1991); *Grand Island School Dist. #2 v. Celotex Corp.*, 203 Neb. 559, 279 N.W.2d 603 (1979) (applicable statute of limitations is the one in force at the time the suit is brought).

Thus, because the extension of a statute of limitations to offenses not barred by a previous period of limitations does not affect a defendant's existing rights or defenses, the application of the extended statute to existing causes of action is not a retroactive law.

We are not unmindful that, as the Court of Appeals noted, statutes of limitations are to be liberally construed in favor of the defendant in a criminal case. *State v. Nuss*, 235 Neb. 107, 454 N.W.2d 482 (1990); *Jacox v. State*, 154 Neb. 416, 48 N.W.2d 390 (1951); *Hogoboom v. State*, 120 Neb. 525, 234 N.W. 422 (1931).

However, in the instant case, applying the extended period of limitations to Hirsch's cause of action does not impair any vested right nor deprive him of a defense available according to law at the time when the act was committed; there is no change in legal consequences. See *Denver Wood Products Co., supra* (person has no vested right in the running of a statute of limitations unless it has completely run and barred the action before the new limitation becomes effective). The crime for which Hirsch was indicted, the punishment prescribed, and the quantity or degree of proof necessary to establish guilt all remain unaffected by the extended statute. *Dobbert v. Florida*, 432 U.S. 282, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977), *reh'g denied* 434 U.S. 882, 98 S. Ct. 246, 54 L. Ed. 2d 166. See, *People v Russo, supra*; *Com. v. Guimento*, 341 Pa. Super. 95, 491 A.2d 166 (1985); *Falter v. United States*, 23 F.2d 420 (2d Cir. 1928), *cert. denied* 277 U.S. 590, 48 S. Ct. 528, 72 L. Ed. 1003

(defendant's right to rely upon statute of limitations as it existed when alleged crime was committed applies only when it has vested). See, also, *Grand Island School Dist. #2, supra* (completed bar is a substantive, vested right which the Legislature cannot abrogate); *Tyson v. Johns-Manville Sales Corp.*, 399 So. 2d 263 (Ala. 1981) (defendant's vested right to rely on statutes as a defense if cause of action has become barred).

(c) Procedural Nature of Statutes of Limitations

Although not germane to the adjudication of this appeal, we take the opportunity to address the Court of Appeals' incorrect suggestion that in a criminal case, the statute of limitations may be considered substantive in nature. The Court of Appeals appears to have reached that conclusion in an effort to harmonize our decisions holding that statutes of limitations are procedural in nature with its holding that the Hirsch charge was time barred. However, the fact that the procedural rules applied are those in effect at the time of the proceeding does not preclude a finding that, under appropriate circumstances, an action has been time barred by a prior statute. In *Tyson, supra,* the court considered which of two successive statutes of limitations should be applied. Prior to the case then before the court, it had held that the statute in effect at the time of the commencement of the action should apply rather than the statute in effect at the time the cause of action arose. The *Tyson* court, however, clearly distinguished cases where the later period of limitations had been enacted before the action was time barred. Under both a vested-right defense in its state's constitution and the prohibition against ex post facto laws, the *Tyson* court found that the action was barred by the statute of limitations in existence at the time of the commencement of the action. See, also, *State v. Noah*, 246 Kan. 291, 788 P.2d 257 (1990) (criminal statute of limitations is procedural, and amendment of the statute may be applied to criminal acts occurring prior to the date of the amendment if the crimes charged have not been barred prior to that date); *State v. Casaretto*, 818 S.W.2d 313 (Mo. App. 1991) (new statute of limitations passed after events criminal defendant was charged

with allegedly occurred but before old limitations period had run was procedural and, thus, permissibly extended the statutory period).

### (d) District Court Ruling

Because the period of limitations had not yet barred the crime as alleged in the information, the district court did not err in overruling Hirsch's demurrer.

### 2. DENIAL OF DIRECTED VERDICT

In view of our determination that the prosecution is not time barred, we, in the interest of judicial economy, address as well the assignments of error the Court of Appeals did not find it necessary to reach, rather than remanding the cause in order that the Court of Appeals might first consider those matters.

As first noted in part I, Hirsch, in the second assignment of error, complains of the district court's failure to direct a verdict in his favor.

### (a) Scope of Review

In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Wegener*, 239 Neb. 946, 479 N.W.2d 783 (1992); *State v. Zitterkopf*, 236 Neb. 743, 463 N.W.2d 616 (1990); *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989). That is to say, a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, where an issue should be decided as a matter of law. *Vredeveld v. Clark*, 244 Neb. 46, 504 N.W.2d 292 (1993).

If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law. *Id.*; *Marple v. Sears, Roebuck & Co.*, 244 Neb. 274, 505 N.W.2d 715 (1993); *Leonard v. Wilson*, 238 Neb. 1, 468 N.W.2d 604 (1991).

Moreover, in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters

are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Russell*, 243 Neb. 106, 497 N.W.2d 393 (1993); *State v. Osborn*, 241 Neb. 424, 490 N.W.2d 160 (1992); *State v. Davis*, 240 Neb. 631, 483 N.W.2d 554 (1992).

### (b) Availability of Claim

At this point, we must address the State's contention that Hirsch has improperly assigned error because he adduced evidence after his motion for a directed verdict at the close of the State's evidence was overruled. In support of this position, the State cites *State v. Back*, 241 Neb. 301, 488 N.W.2d 26 (1992), which does indeed hold that a defendant who moves for a directed verdict at the close of the State's case and proceeds with trial waives any error in the ruling on that motion, but may challenge the sufficiency of the evidence for the defendant's conviction. A distinction must be made, however, between that situation and one wherein a second motion for directed verdict is made at the conclusion of all the evidence. When a defendant makes a motion at the close of the State's case in chief and again at the conclusion of all the evidence, it is proper to assign as error that the defendant's motion for directed verdict made at the conclusion of all the evidence should have been sustained. See, *State v. Tingle*, 239 Neb. 558, 477 N.W.2d 544 (1991); *State v. Brown*, 225 Neb. 418, 405 N.W.2d 600 (1987). In the instant case, Hirsch renewed his motion for directed verdict at the end of trial, and it was proper for him to assign the overruling of that motion as error.

### (c) Evidence of Crime

Section 28-319 prohibits, among other things, one who, like Hirsch, is 19 years of age or over from sexually penetrating one who, like the daughter, is less than 16 years of age. Neb. Rev. Stat. § 28-318 (Reissue 1989) defines sexual penetration as including any intrusion, however slight, of any part of the actor's body into the genital or anal openings of the victim's body. The emission of semen is not required.

Consistent with the statutory language, we have held that the

slightest intrusion into the genital opening is sufficient to constitute penetration in a prosecution for first degree sexual assault, and such element may be proved by either direct or circumstantial evidence. *State v. Craig*, 219 Neb. 70, 361 N.W.2d 206 (1985); *State v. Tatum*, 206 Neb. 625, 294 N.W.2d 354 (1980); *State v. Holloman*, 197 Neb. 139, 248 N.W.2d 15 (1976); *State v. Atkinson*, 190 Neb. 473, 209 N.W.2d 154 (1973). It is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient. *Atkinson, supra.*

Hirsch argues that the only evidence about actual sexual penetration occurred when the daughter testified that the pain was "like up inside me." But as detailed in part II, the record reveals more than sufficient evidence of penetration given by several witnesses. The daughter herself testified to several instances of penetration by Hirsch during the period encompassed by the information. She testified that during the November 26, 1986, incident, Hirsch started touching her with his finger and then got on top of her with his legs around her. The daughter then started to feel a "really bad pain" that was "up inside [her]," in her vagina. In the third incident on or about December 25, 1986, the daughter testified Hirsch started touching her with his hands and got on top of her again; this time she "hurt and . . . hurt . . . hurt inside."

Although the daughter did not use the word penetration, her testimony was nonetheless sufficient to show that penetration occurred. In *Brown, supra*, we sustained the conviction of a defendant charged with first degree sexual assault on a 9-year-old victim. We refused to require that a youthful victim testify about an act of cunnilingus in vocabulary used by a gynecologist or provide the type of detailed description which might otherwise be found in some sordid novel.

Hirsch argues that the daughter's testimony is contradicted by her interview with Mullen in which the daughter stated that Hirsch put "his private against her private and that it hurt a lot." Mullen, however, testified that although she had difficulty understanding if Hirsch actually penetrated or not, the daughter did describe that it hurt a lot. Mullen further elaborated that "it's difficult for [children] to say penetration or

not. They can say exactly what happened and they can say it hurt a lot, but . . . they may not be aware if it was inside their body, or outside their body or partially inside their body . . . ." When Mullen was asked if the daughter had told her that she (the daughter) did not know if Hirsch had ever penetrated her or not, Mullen responded that she did not remember the daughter denying penetration. What Mullen did recall is the very common description of putting "the penis against the private opening" and it hurting. Mullen testified that when she asked the daughter if Hirsch had penetrated her, the daughter replied that it hurt, but she did not know. She could describe the pressure, but she did not answer specifically that Hirsch had or had not penetrated her.

Moreover, Hirsch ignores Monteleone's testimony. Monteleone found abnormalities indicating that the daughter had been vaginally penetrated, although he could not tell what had penetrated her or when she had been penetrated. He described a distortion in the opening and a vaginal or hymenal tag in one corner of the daughter's hymen, along with synechiae associated with irritation of the vagina. Monteleone testified that these injuries could have transpired 2, 3, or 4 years ago. In addition, Ballenger testified that while the medical records did not mention penetration and that the daughter had never mentioned penetration during her disclosures in her third stay at the hospital, she had, at that point, only disclosed the showering incidents that had occurred with Hirsch.

Instead, Hirsch argues that the daughter had a history of sticking foreign objects into her vagina. There was some testimony that the wife had told several witnesses that the daughter had inserted an object into her vagina. However, the wife denied telling anyone that the pencil had been inserted. She described observing the daughter when the daughter was about 2 years old with a pencil in between her legs, but the pencil was never inserted. The daughter testified that she did not recall ever sticking any foreign object into her vagina.

Hirsch also relies on the testimony of Flearl, who examined the daughter when spots of blood were found on her underwear. Flearl could not be specific as to the causes of the spotting but was sure that the daughter was not bleeding from the inside.

Despite this diagnosis, Flearl stated it was a question in her mind where the blood came from. It was Monteleone's view that Flearl had made a mistake in not examining the cause of blood.

### (d) District Court's Ruling

Thus, the evidence is such that the jury reasonably could have found that Hirsch sexually penetrated the daughter on two occasions during the period of time specified in the information: on November 26, 1986, and again around Christmas, i.e., on or about December 25, 1986. Given that in light of Hirsch's conviction the evidence must be construed most favorably to the State, see *State v. Zitterkopf*, 236 Neb. 743, 463 N.W.2d 616 (1990), it therefore cannot be said that the district court erred in overruling Hirsch's motion for directed verdict made at the close of all the evidence.

### 3. DENIAL OF NEW TRIAL

In the third and last assignment of error, Hirsch asserts the district court incorrectly refused to grant him a new trial because of newly discovered evidence.

### (a) Scope of Review

"A new trial, after a verdict of conviction, may be granted . . . for any of the following reasons affecting materially his substantial rights . . . (5) newly discovered evidence material for the defendant which he could not with reasonable diligence have discovered and produced at the trial . . . ." Neb. Rev. Stat. § 29-2101 (Reissue 1989).

A motion for new trial on the basis of newly discovered evidence is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed on appeal. *State v. Boppre*, 243 Neb. 908, 503 N.W.2d 526 (1993); *State v. Campbell*, 239 Neb. 14, 473 N.W.2d 420 (1991); *State v. Jensen*, 238 Neb. 801, 472 N.W.2d 423 (1991).

### (b) Evidence Claimed to Be Newly Discovered

Hirsch argues that a videotape taken during Christmas 1987 constitutes newly discovered evidence supportive of a new trial. The videotape depicts the daughter interacting with Hirsch

during the exchanging of Christmas presents. More specifically, it shows the daughter sitting with Hirsch, allowing him to touch and hug her, smiling and laughing with him. Hirsch represents that a psychotherapist would testify that based on the tape, the daughter was not being truthful when she testified that Hirsch sexually abused her.

Hirsch urges that as the videotape was in the possession of his brother, as he had no intent to videotape the Christmas festivities, and as no one individual did the actual videotaping, it is unreasonable to expect him to have remembered it when he was charged with a crime years later.

Assuming, without deciding, that the evidence was otherwise admissible, it simply does not qualify as being newly discovered. In order to qualify as such, the evidence may not be something which could have been uncovered and produced at trial with reasonable diligence. See, *Boppre, supra*; *Jensen, supra*. In *Pence v. Liermann*, 191 Neb. 614, 216 N.W.2d 746 (1974), we wrote that one moving for a new trial on the ground of newly discovered evidence must show that the evidence was uncovered since the trial, that the evidence was not equally available before the trial, and that the evidence was not simply discovered by the exercise of belated diligence. Evidence is not newly discovered if diligence before the trial would have produced notice or knowledge of the alleged recently uncovered evidence. *Maddox v. First Westroads Bank*, 199 Neb. 81, 256 N.W.2d 647 (1977).

This court has defined reasonable diligence as appropriate action where there is some reason to awaken inquiry and direct diligence in a channel in which it will be successful. *State v. Munson*, 204 Neb. 814, 285 N.W.2d 703 (1979).

In *The People v. Williams*, 242 Ill. 197, 89 N.E. 1030 (1909), a defendant made application for a new trial on the basis of the affidavit of his wife's physician establishing that the defendant was at home on the day the larceny occurred. The court denied the application, finding it difficult to believe with so serious a charge as this made against the defendant that he never inquired of the physician and nurse as to their recollection of his whereabouts.

In the instant case, the videotape could have been uncovered

by the exercise of diligence prior to trial. Even assuming as true that no one person did the taping, Hirsch was aware of and remembered that the taping was being done that day; in fact, it was Hirsch's video camera that was used. Not knowing the tape still existed and not recalling or having forgotten the tape do not excuse failing to discover its existence when Hirsch offers no evidence of any previous attempts to locate the tape either through his brother, who had possession of it, or any of the other at least five adults present during the visitation and taping.

As early as in *Upton v. Levy*, 39 Neb. 331, 58 N.W. 95 (1894), we refused to grant a new trial on the ground of newly discovered evidence when it appeared that such evidence was not produced at trial because the litigant had forgotten its existence. We stated that if courts should grant litigants new trials in order to enable them to produce evidence which they had forgotten exists, there would be few final judgments. See *State v. Perez*, 235 Neb. 796, 457 N.W.2d 448 (1990) (trial court did not abuse its discretion in denying defendant's motion for new trial made on grounds of newly discovered evidence which consisted of defendant's sudden recollection after listening to tape recording of his drug sale, where tape was in his possession far in advance of trial and defendant failed to act with reasonable diligence by neglecting to review tape and refresh his memory until after trial).

Other jurisdictions have also held that forgetfulness is inconsistent with the diligence required in presenting the evidence during the trial, and such lack of due diligence does not warrant a new trial on the basis of newly discovered evidence. See, *United States v. Leyba*, 504 F.2d 441 (10th Cir. 1974), *cert. denied* 420 U.S. 934, 95 S. Ct. 1139, 43 L. Ed. 2d 408 (1975) (application for new trial to introduce testimony of witnesses known to, but forgotten by, party at time of trial denied); *State v. Daymus*, 93 Ariz. 332, 380 P.2d 996 (1963) (facts or evidence not introduced or otherwise made use of at trial because they were forgotten until after the trial do not constitute newly discovered evidence); *Com. v. Duest*, 30 Mass. App. 623, 572 N.E.2d 572 (1991), *review denied* 410 Mass. 1103,. 577 N.E.2d 309 (recollection of fact after trial does not

constitute newly discovered evidence justifying new trial, since such recollection pertains to known rather than unknown, to which concept of discovery applies; by due attention fact might have been remembered); *Lewis v. State*, 367 So. 2d 542 (Ala. Crim. App. 1978), *writ denied* 367 So. 2d 547 (Ala. 1979) (new trial denied where defendant, who could not remember last name of potential defense witness, did subsequently remember name of witness, since this was not newly discovered evidence, but, rather, newly disclosed evidence). But cf. *Archer v. Whitten*, 120 Minn. 433, 139 N.W. 815 (1913) (newly discovered evidence consisting of letter claimed to be admission of plaintiff and of which defendant had no recollection and which he had discovered accidentally was grounds for new trial).

### (c) District Court's Ruling

As the district court cogently noted, the videotape was not newly discovered evidence, it was merely "newly remembered" evidence. Accordingly, the district court did not err in refusing to grant a new trial.

### IV. JUDGMENT

For the foregoing reasons, the judgment of the Court of Appeals is reversed and the cause remanded with the direction that the judgment of the district court be reinstated.

REVERSED AND REMANDED WITH DIRECTION.